UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CRIMSON GALERIA LIMITED PARTNERSHIP, RAJ & RAJ, LLC, HARVARD SQUARE HOLDINGS LLC, and CHARLES RIVER HOLDINGS LLC <br><br> Plaintiffs, <br><br> v. <br><br> HEALTHY PHARMS, INC.; TIMBUKTU REAL ESTATE, LLC; PAUL OVERGAAG, an individual; NATHANIEL AVERILL, an individual; 4FRONT ADVISORS, LLC; 4FRONT HOLDINGS LLC; KRISTOPHER T. KRANE, an individual; 3 BROTHERS REAL ESTATE, LLC; RED LINE MANAGEMENT, LLC; JOHN DOES 1 THROUGH 4; TOMOLLY, INC.; CITY OF CAMBRIDGE, a body politic; TOWN OF GEORGETOWN, a body politic; MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH; CENTURY BANK AND TRUST COMPANY; MAURA T. HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts <br><br> Defendants. | Civil Action No.: |

## **COMPLAINT**

Plaintiffs Crimson Galeria Limited Partnership ("Crimson Galeria"); RAJ & RAJ, LLC ("RAJ & RAJ"); Harvard Square Holdings, LLC ("Harvard Square Holdings"); and Charles River Holdings, LLC ("Charles River Holdings"), file this suit for damages and injunctive and declaratory relief to vindicate the federal laws prohibiting and regulating the cultivation and sale of marijuana and their rights under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs are Massachusetts abutting or nearby property owners who have been substantially injured by a conspiracy to sell marijuana near or next to their properties. Plaintiffs seek a declaration of rights and other relief, including, but not limited to redress under RICO, which requires those who engage in racketeering activity—including the commercial production of marijuana—to pay those they injure treble damages, costs, and attorneys' fees. Plaintiffs also seek an injunction under RICO directing the marijuana operations affecting their properties to cease and desist violating the federal drug laws. In addition to their RICO claims, Plaintiffs are also joining the state and local officials as necessary parties who are facilitating and encouraging violations of the federal drug laws by licensing and permitting marijuana businesses. Because state and local government actions that promote the marijuana industry directly conflict with the federal Controlled Substances Act ("CSA"), those actions are preempted under the Supremacy Clause of the United States Constitution and must be set aside.

## I. PARTIES

1.  Crimson Galeria Limited Partnership ("Crimson Galeria") is a Massachusetts limited partnership organized by law with a usual place of business at 1299 Beacon Street, Brookline, Norfolk County, Massachusetts 02446. Crimson Galeria is the owner of the commercial real property located at 57 JFK Street, Cambridge, MA. Raj Dhanda, 57 Powell Street, Brookline, MA 02146 is the registered agent and a general partner.

2.  RAJ & RAJ LLC ("RAJ & RAJ") is a Massachusetts limited liability company organized by law with a usual place of business at 1299 Beacon Street, Brookline, Norfolk County, Massachusetts 02446. RAJ & RAJ is the owner of the commercial real property located at 96 Winthrop Street, Cambridge, MA. Raj K. Dhanda, 67 Powell Street, Brookline, MA 02446 is the registered agent and Manager.

3.  Harvard Square Holdings LLC ("Harvard Square Holdings") is a Massachusetts limited liability company organized by law with a usual place of business at 1299 Beacon Street, Brookline, Norfolk County, Massachusetts 02446. Harvard Square Holdings, is the owner of the commercial real property located at 52-54 JFK Street, Cambridge, MA. Raj K. Dhanda, 67 Powell Street, Brookline, MA 02446 is the registered agent and Manager.

4.  Charles River Holdings LLC ("Charles River Holdings") is a Massachusetts limited liability company organized by law with a usual place of business at 1299 Beacon Street, Brookline, Norfolk County, Massachusetts 02446. Charles River Holdings is the owner of the commercial real property located at 16-18 Eliot Street, Cambridge, MA. Raj K. Dhanda, 1299 Beacon Street, Brookline, MA 02446 is the registered agent and Manager.

5.  The above-named entities, at all times material hereto, had Raj K. Dhanda as the manager of each of the above mentioned limited liability companies, and Mr. Dhanda is a general partner of Crimson Galeria.

6.  Defendant Healthy Pharms, Inc. ("Healthy Pharms") is a Massachusetts corporation organized as a nonprofit corporation under M.G.L. c. 180, with a principal place of business at 401 East Main Street, Georgetown, Massachusetts 01833. Nathaniel L.

3

Averill, is President of Healthy Pharms and Paul Overgaag, is the Treasurer and a

Director of Healthy Pharms. Nathaniel L. Averill, 30 Victoria St. Apt. 3, Somerville,

MA 02144 is the registered agent.

7.  Defendant, Timbuktu Real Estate, LLC ("Timbuktu"), is a Massachusetts limited

liability company organized by law with a usual place of business at 10 Eliot St.,

Cambridge, MA 02138. Paul Overgaag, 22 Milton St. No. 2, Somerville, MA 02144 is

the Manager and registered agent of Timbuktu.

8.  Defendant, 3 Brothers Real Estate, LLC ("3 Brothers"), is a Massachusetts limited

liability company organized by law with a usual place of business at 10 Eliot St.,

Cambridge, MA 02138. Paul Overgaag, 10 Eliot Street, Cambridge, MA 02138 is the

Manager and registered agent of 3 Brothers.

9.  Defendant, Red Line Management, LLC ("Red Line") is a Massachusetts limited

liability company organized by law with a usual place of business at 30 Victoria Street,

Somerville, MA 02144. According to the records of the Secretary of the

Commonwealth, there is no listed Manager, and the registered agent of Red Line is

Valerio Romano, Esq., 1400 Hancock Street, 3rd Floor, Quincy, MA 02169. Nathaniel

Averill and Paul Overgaag are named as authorized to execute documents and record

recordable instruments.

10. Defendant 4Front Advisors, LLC ("4Front"), is a foreign limited liability company

organized under the laws of the State of Arizona with a usual place of business at 5060

N 40TH STREET, SUITE 120, PHOENIX, AZ 85018, and registered to do business in

Massachusetts. Kristopher T. Krane, ONE STATE ST, SUITE 1250 BOSTON, MA

02109 is the Manager along with Joshua N. Rosen, 5060 N 40th Street, Suite 120,

Phoenix, AZ 85018, and Andrew Thut, 369 Elm Street, Concord, MA 01742 is the registered agent of 4Front.

11. Defendant 4Front Holdings LLC ("4Front Holdings"), is a foreign limited liability company organized by under the laws of the State of Delaware with a usual place of business at 5060 N 40TH STREET, SUITE 120, PHOENIX, AZ 85018 USA, and registered to do business in Massachusetts. According to the records of the Secretary of the Commonwealth, Josh Rosen, Trevor Pratt, and Karl Chowscano, 5060 N 40TH STREET, SUITE 120, PHOENIX, AZ 85018 USA are the Managers and Incorp Services, Inc., 44 School Street, Suite 325, Boston, MA 02108 is the registered agent of 4Front Holdings.

12. Defendant Tomolly, Inc. ("Tomolly"), is a Massachusetts corporation with a usual place of business at 10 Eliot Street, Cambridge, MA 02138. Tomolly's President and registered agent is Paul Overgaag, 10 Eliot Street, Cambridge, MA 02138.

13. Defendant Kristopher T. Krane, upon information and belief, is an individual residing at 219 Kittredge St, Roslindale MA 02131-4138.

14. Defendant City of Cambridge is a body politic in Massachusetts having an address of City Hall, 344 Broadway, Cambridge, MA 02139.

15. Defendant Town of Georgetown is a body politic in Massachusetts having an address of Town Hall, 1 Library Street, Georgetown, MA 01833.

16. Defendant Paul Overgaag is an individual residing at 22 Milton Street, #2, Somerville, MA 02144.

17. Defendant Nathaniel Averill is an individual residing at 30 Victoria Street, Apartment #3, Somerville, MA 02144.

18. Defendant Century Bank and Trust Company ("Century Bank") is a Massachusetts trust company and commercial bank with a principal place of business at 400 Mystic Ave., Medford, MA 02155.

19. Plaintiffs are unaware at the time of filing this Complaint of the true name and capacity of the Defendant sued herein as John Doe 1, and have therefore sued said Defendant by such fictitious name. Plaintiffs will amend this Complaint to assert the true name and capacity of said Defendant when it has been ascertained. John Doe 1 is the provider of property insurance to Healthy Pharms, 3 Brothers, or Red Line, for the marijuana cultivation facility located at 401 East Main Street, Georgetown, Massachusetts.

20. Plaintiffs are unaware at the time of filing this Complaint of the true name and capacity of the Defendant sued herein as John Doe 2, and have therefore sued said Defendant by such fictitious name. Plaintiffs will amend this Complaint to assert the true name and capacity of said Defendant when it has been ascertained. John Doe 2 is the provider of general liability insurance to Healthy Pharms, 3 Brothers, or Red Line, for the marijuana cultivation facility located at 401 East Main Street, Georgetown, Massachusetts.

21. Plaintiffs are unaware at the time of filing this Complaint of the true name and capacity of the Defendant sued herein as John Doe 3, and have therefore sued said Defendant by such fictitious name. Plaintiffs will amend this Complaint to assert the true name and capacity of said Defendant when it has been ascertained. John Doe 3 is the provider of property insurance to Healthy Pharms, Timbuktu, or Red Line, for the RMD located at 98 Winthrop Street, Cambridge, Massachusetts.

22. Plaintiffs are unaware at the time of filing this Complaint of the true name and capacity of the Defendant sued herein as John Doe 4, and have therefore sued said Defendant by such fictitious name. Plaintiffs will amend this Complaint to assert the true name and capacity of said Defendant when it has been ascertained. John Doe 4 is the provider of general liability insurance to Healthy Pharms, Timbuktu, or Red Line, for the marijuana cultivation facility located at 98 Winthrop Street, Cambridge, Massachusetts.

23. Defendant Massachusetts Department of Public Health ("DPH") is a body politic of the Commonwealth of Massachusetts having an address of 250 Washington Street, 2nd Floor, Boston, MA 02108 and Monica Bharel serves as DPH Commissioner.

24. Defendant Maura T. Healey is the Attorney General of the Commonwealth of Massachusetts and is named in her official capacity. As Massachusetts's chief legal officer, Healey is responsible for legal compliance of the state's marijuana laws. The State Attorney General's mailing address is One Ashburton Place, Boston, MA 02108-1518.

## II. JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over Plaintiffs' RICO claims under 18 U.S.C. § 1964(c), 28 U.S.C. § 1331, and 28 U.S.C. § 2201. This Court also has subject matter jurisdiction over Plaintiffs' federal preemption claims under 28 U.S.C. § 1331, and the Plaintiffs seek remedies for their federal preemption claims under 28 U.S.C. §§ 1651, 2201, and 2202. This Court also has subject matter jurisdiction over Plaintiffs' Declaratory Judgment claims under 28 U.S.C. § 2201(a).

26. This Court has personal jurisdiction over all Defendants and venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial portion, if not virtually all, of

the events giving rise to this suit occurred and are occurring in Massachusetts. Venue

over Plaintiffs' RICO claims is also proper under 18 U.S.C. § 1965(a) because the

RICO defendants reside in Massachusetts or transact affairs in Massachusetts.

## III. INTRODUCTION

27. It is a bedrock principle of the United States Constitution that federal law is the

supreme law of the land. The Supreme Court of the United States has held that:

"[S]ince our decision in *M'Culloch v. Maryland*, it has been settled that state law that

conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Group, Inc.*, 505

U.S. 504, 516 (1992)(internal citations omitted)(quoting *Maryland v. Louisiana*, 451

U.S. 725, 746 (1981)). On the issue of marijuana, federal law is clear: it is a felony

under the Controlled Substances Act of 1970 ("CSA") to deal in marijuana. Despite the

express federal prohibition on marijuana, Massachusetts and many of its local

jurisdictions have enacted laws, ordinances, and regulations designed to promote the

growth of a billion-dollar commercial marijuana industry. Yet, notwithstanding that

recreational and medicinal marijuana is now "legal" in Massachusetts, the drug's

cultivation, sale, and possession remain serious federal criminal offenses in

Massachusetts and conflict with federal law. Indeed, those associated with

Massachusetts's largest-scale marijuana producers risk lengthy terms in federal prison.

The people of Massachusetts are free to advocate for a repeal of this federal criminal

prohibition, but they must do so through their elected representatives in Congress.

Under our federal system, Congress alone can authorize revision of federal laws

prohibiting the commercial trade in marijuana.

28. In recent years the United States Department of Justice (DOJ) has largely declined to bring prosecutions under the federal marijuana laws due to fiscal restraints, prompting millions of investment dollars and thousands of new customers to flow into Massachusetts's commercial marijuana industry. Congress in 2015 enacted an appropriations rider (the "Rohrabacher-Farr Amendment") that prevents DOJ from spending money "to prevent . . . States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated and Further Appropriations Act 2015, Pub. L. No. 113-235, Section 538, 128 Stat. 2130, 2217 (2014); *See United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) (concluding that this provision prevents DOJ from spending money to prosecute marijuana dealers who comply with state medical marijuana laws). This rider merely prevents DOJ from spending money, but does not change what the CSA preemptively prohibits. DOJ asked Congress not to renew that rider in a letter dated May 1, 2017 from Attorney General Jefferson B. Sessions, III, Re: Department of Justice Appropriations. Attorney General Sessions states in his letter of May 1, 2017 "It is thus unsurprising that in the last administration both the Department of Health and Human Services and the DEA concluded that 'marijuana has a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision." *See* Denial of Petition to Initiate Proceedings to Reschedule Marijuana, 81 Fed. Reg. 53,688, 53,689 (Aug. 12, 2016). Moreover, in a recently issued presidential signing statement, the Executive Branch reserved the right to ignore the medical marijuana protections, stating "I [President Trump] will treat this provision [Division B, section 537] consistently with my constitutional responsibility to

9

take care that the laws be faithfully executed." *See* Statement by President Donald J. Trump on Signing H.R. 244 into Law (May 5, 2017). The DOJ's current policy of non-enforcement does not strike a single word from the U.S. Code or deprive private individuals of their judicially enforceable rights under federal law. The DOJ can no more amend a federal statute than can the Commonwealth of Massachusetts, and marijuana remains just as illegal under federal law today as it was when Congress passed the Controlled Substances Act in 1970.

29. Amongst other matters, marijuana businesses make bad neighbors, which include without limitation, emitting pungent odors, attracting undesirable visitors, increasing criminal activity, driving down property values, and limiting the rental of premises. Crimson Galeria, RAJ & RAJ, Harvard Square Holdings, and Charles River Holdings, are property owners who have suffered serious and substantial injuries caused by the operations of a nearby marijuana business, including, but not limited to, significant diminution in property value, restricted ability to lease space, and infringement of the ability to pursue a redevelopment plan to bring certain of their properties to their highest-and-best use. Together, they are filing this suit to vindicate federal law.

30. Dealing in marijuana is racketeering activity under RICO, and those who engage in a pattern of racketeering activity through a corporation or other enterprise are liable for three times the economic harm they cause plus costs and attorneys' fees. Those who conspire with racketeers by agreeing to assist them are likewise liable. RICO also gives Federal Courts the power to order racketeering enterprises and their coconspirators to cease their unlawful operations. Accordingly, the Plaintiffs ask this Court to award them the damages, costs, and fees to which they are entitled, and request that the Court

order the RICO Defendants to cease their open and notorious violation of federal law

and enter injunctive relief preventing further violation of federal law.

31. Furthermore, the CSA preempts the practice of state and local officials in

Massachusetts of issuing licenses to operate marijuana businesses. Those licenses not

only purport to authorize, but also affirmatively assist the illegal conduct of those who

receive them by making it easier for license holders to attract investors and customers.

Marijuana business licensing directly conflicts with and poses a major obstacle to

federal law's goal of reducing marijuana trafficking and possession through an almost

total prohibition on the drug's cultivation and distribution. It is impossible to comply

with both the Massachusetts marijuana business licensing laws and the federal CSA.

The two laws are wholly inconsistent; state law authorizes, facilitates, and promotes

what federal law criminalizes and prohibits.   Accordingly, Plaintiffs request that the

Court order the named state and local governmental defendants to withdraw the

marijuana licenses they have issued so far and not to issue any additional such licenses

in the future or at the very least withdraw the marijuana affiliated license(s) issued to

Healthy Pharms, Inc., their subsidiaries, assigns, related entities, board members,

owners or operators.

32. In 2012, the Commonwealth of Massachusetts decriminalized the sale and use of

medical marijuana at RMDs. The Act authorized the Massachusetts Department of

Public Health (DPH) to issue regulations for the implementation of certain sections of

the Act. In May 2013, the DPH promulgated siting regulations pursuant to the Act,

which regulations authorized municipalities to regulate the medical use of marijuana, as

long as the local regulation did not conflict or interfere with the DPH regulations. One

such regulation established by DPH was a default buffer zone relating to the siting of RMDs in proximity to child centered locations for cities, which have not established their own buffer zones. This default buffer zone under Massachusetts law is 500 feet from a school, daycare center, or any facility in which children commonly congregate. 105 C.M.R. § 725.110 (A) (14) (2013). In August 2016, the DPH updated its "Guidance for Municipalities Regarding the Medical Use of Marijuana." For the buffer zone, the DPH stated: "Municipalities may set their own buffer zone, but if they do not, the default buffer zone will be the 500 foot distance described in the [DPH Siting Regulation]." The City of Cambridge changed the buffer zone to 250 feet for their MMD-4 overlay district. The Commonwealth of Massachusetts default buffer zone (500 feet) and the City of Cambridge modified buffer zone (250 feet) directly conflicts with a specific federal law, which treats dealing in marijuana (a controlled substance) within 1000 feet of a school or college as an especially serious crime. 21 U.S.C. § 860(a). Moreover, 21 U.S.C. § 860(a) also makes it an especially serious crime to deal in marijuana within 1000 feet of a playground, among other prescribed types of facilities/areas. *Id*.

33. The City of Cambridge Planning Board's grant of a Special Permit for Healthy Pharms to operate a RMD at 98 Winthrop Street, Cambridge, Massachusetts and the fact that Healthy Pharms operates a marijuana cultivation facility at 401 East Main Street, Georgetown, Massachusetts that supplies marijuana to the Cambridge facility, are in direct contravention of a federal statute—Maintaining drug-involved premises, 21 U.S.C. § 856(a).

34. The Town of Georgetown grant of a permit for Healthy Pharms to operate a RMD and cultivation facility at 401 North Main Street, Georgetown, Massachusetts and the fact that Healthy Pharms operates a marijuana cultivation facility at 401 East Main Street, Georgetown, Massachusetts are in direct contravention of a federal statute— Maintaining drug-involved premises, 21 U.S.C. § 856(a).

35. By maintaining a website (www.healthypharms.org) that promotes the sale of a Schedule I drug, i.e. marijuana, defendant Healthy Pharms used an instrumentality of interstate commerce (the internet) to advertise for sale a Schedule I drug (marijuana) in violation of 21 U.S.C. § 843(c)(2)(A)(B). Upon information and belief, Paul Overgaag, Nathaniel Averill, Healthy Pharms employees, and Timbuktu employees utilized email and the United States Postal Service (USPS) to communicate about their marijuana enterprise in violation of 21 U.S.C. 843(b) *Communications Facility*.  Healthy Pharms also maintains a Facebook page located at the following URL: https://www.facebook.com/pg/healthypharms/posts/?ref=page_internal  that advertises the sale of marijuana and promotes its illegal business activities. The comments section offers reviews that confuse the public, contain certain false statements described in detail below, and are potentially misleading. This is in violation of 21 U.S.C. § 843(c)(2)(A)(B). Healthy Pharms also advertises its facility on Allbud, https://www.allbud.com/dispensaries/massachusetts/haverhill/healthy-pharms. This is in violation of 21 U.S.C. § 843(c)(2)(A)(B). Healthy Pharms also advertises its facility on Potguide.com, https://potguide.com/massachusetts/marijuana-dispensaries/georgetown/healthy-pharms/. This is in violation of 21 U.S.C. § 843(c)(2)(A)(B). Healthy Pharms also advertises its services and facilities on Yelp,

https://www.yelp.com/biz/healthy-pharms-georgetown. This is in violation of 21 U.S.C. § 843(c)(2)(A)(B)

36. By maintaining a website (http://4frontadvisors.com) that facilitates the providing of material support to marijuana companies, including, but not limited to Healthy Pharms, defendant 4Front used an instrumentality of interstate commerce (the internet) to advertise for sale a Schedule I drug (marijuana) in violation of 21 U.S.C. § 843(c)(2)(A)(B). Upon information and belief, Kristopher T. Krane and employees of 4Front utilized email and the United States Postal Service (USPS) to communicate with Paul Overgaag, Nathaniel Averill, and other Healthy Pharms, Inc. employees, managers, and investors about Healthy Pharms, Inc.'s marijuana enterprise in violation of 21 U.S.C. 843(b) *Communications Facility*. Upon information and belief, 4Front Holdings provides or has provided monetary and material support and/or is the beneficiary of consulting activities concerning marijuana conducted by 4Front that has materially supported Healthy Pharms and the other defendants.

37. DPH regulations require that RMDs operate as non-profits. Healthy Pharms violates 105 C.M.R. 725.100(A)(1) and "[DPH] Guidance for Registered Marijuana Dispensaries Regarding Non-Profit Compliance," (updated May 15, 2015). Upon information and belief, there is a material, insufficiently addressed, conflict of interest between the Landlord, the Tenant, and Paul Overgaag that calls into serious question the non-profit status of Healthy Pharms. Upon information and belief, there is also concern as to whether Healthy Pharms is in fact and in reality a "Massachusetts nonprofit corporation" or in fact whether its purported non-profit status is merely a sham. By way of example, and without limitation, the applicant (Healthy Pharms) and

14

owner of the real estate located at 98 Winthrop Street, Cambridge, MA (Timbuktu)
appear to have common management and ownership. The proposed lease between
Timbuktu and Healthy Pharms appears to be at an abnormally high rental and far in
excess of the fair rental value for such limited space and square footage. In addition, the
proposed lease for the RMD indicates that the owner is obligated to buy out the existing
tenant, Tomolly, with a One Million Dollar ($1,000,000.00) payment. Paul Overgaag is
both the sole officer and director of Tomolly, Manager of Timbuktu, Manager of 3
Brothers, Secretary of Commonwealth Signatory and Real Property authority for Red
Line, as well as Director and Treasurer of Healthy Pharms. Furthermore, the lease
arrangement between 3 Brothers and Healthy Pharms involves related parties,
particularly Paul Overgaag again. Upon information and belief, Red Line is used by
Healthy Pharms' principals to extract profit from a supposed "non-profit" entity.

38. The U.S. Environmental Protection Agency (EPA) regulates pesticides under the broad
authority granted in two major statutes: (i) the Federal Insecticide, Fungicide, and
Rodenticide Act ("FIFRA"), 7 U.S.C. ch. 6 § 136 et seq., and (ii) the Federal Food,
Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. ch. 9 § 301 et seq. These laws have
been amended by the Food Quality Protection Act, PUBLIC LAW 104-170—Aug. 3,
1996, and the Pesticide Registration Improvement Act. FIFRA requires that all
pesticides sold or distributed in the United States (including imported pesticides) be
registered by the EPA. FFDCA requires the EPA to set pesticide tolerances for all
pesticides used in or on food or in a manner that will result in a residue in or on food or
animal feed. Marijuana edibles, which are sold by Healthy Pharms, Inc., meet the
definition of food and therefore must have pesticide tolerance standards set by the EPA

under the FFDCA. Healthy Pharms indicated that it will use pesticides in the

production of its marijuana supply. See Healthy Pharms Management and Operations

Profile received by DPH on September 11, 2015 at p.14. Labels on pesticides outline

exactly which products it is permissible to use a particular pesticide on, and using any

pesticide on marijuana is illegal. See 40 C.F.R. Part 156. Massachusetts has not

submitted a Special Local Needs Registration under FIFRA Section 24(c) for the use of

pesticides on marijuana. Federal pesticide laws preempt Massachusetts DPH

regulations that facilitate the use of pesticides in marijuana production and supply.

Therefore, Healthy Pharms' use of pesticides in the production and creation of their

marijuana supply (including marijuana edibles), violates federal law and DPH granting

of a marijuana operating license to Healthy Pharms is preempted by federal law.

Massachusetts is facilitating a violation of federal pesticide regulations.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**Federal Law Prohibits the Production and Distribution of Marijuana**

39. Congress passed the CSA in 1970 as Title II of the Comprehensive Drug Abuse

    Prevention and Control Act. 84 Stat. 1236. Among the purposes of the CSA was to

    reduce drug abuse and the illegitimate traffic in controlled substances in the United

    States by prohibiting the unauthorized production, distribution, or possession of

    controlled substances.

40. When it passed the CSA, Congress found that "[t]he illegal importation, manufacture,

    distribution, and possession and improper use of controlled substances have a

    substantial and detrimental effect on the health and general welfare of the American

    people," 21 U.S.C. § 801(2); and that "[a] major portion of the traffic in controlled

16

substances flows through interstate and foreign commerce," id. § 801(3). The CSA addresses the social and economic ills caused by drug abuse and drug trafficking by prohibiting the illicit drug trade.

41. The CSA categorizes drugs according to a series of schedules, with the most dangerous drugs falling under Schedule I. See id. § 812(b). Schedule I drugs have "a high potential for abuse." Id. § 812(b)(1). In enacting the CSA, Congress classified marijuana as a Schedule I drug. Id. § 812(c). Congress thus deemed marijuana to have a high potential for abuse. Id. § 812(b)(1). By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, Congress made the manufacture, distribution, or possession of marijuana a criminal offense, with the sole exception being the use of the drug as part of a Food and Drug Administration preapproved research study. Id. §§ 823(f), 841(a)(1), 844(a).

42. The large-scale manufacture and distribution of marijuana is a serious felony under the CSA. A first-time offender convicted of producing or distributing 1,000 or more marijuana plants is subject to a sentence of 10 years to life imprisonment. Id. § 841(b)(1)(A). Growing 100 or more marijuana plants subjects the first-time offender to a sentence of 5 to 40 years imprisonment. Id. § 841(b)(1)(B). The cultivation and sale of smaller amounts of marijuana is punishable by maximum sentences that can be as long as 20 years. See id. § 841(b)(1)(C), (D). The CSA also criminalizes the possession of marijuana. Unless otherwise authorized by federal law, possession of marijuana by a first-time offender is punishable by up to 1 year of imprisonment. Id. § 844(a).

43. In addition to the prohibitions on cultivation, sale, and possession of marijuana, the CSA also outlaws a wide range of other activities connected with the operations of a

marijuana business. Thus, it is a crime to possess "any equipment, chemical, product, or material" with the intention of using it to manufacture marijuana, id. § 843(a)(6), or to distribute any such material with the knowledge that it will be used to manufacture marijuana, id. § 843(a)(7). The CSA bars the use of a telephone, email, mail, or any other "communication facility" in furtherance of the manufacture or sale of marijuana, id. § 843(b); and it is a federal crime to use the Internet to advertise the sale of marijuana, id. § 843(c)(2)(A). Reinvesting the proceeds from marijuana operations is also a crime, id. § 854(a), as is knowingly facilitating a financial transaction involving funds derived from manufacturing and selling marijuana, 18 U.S.C. §§ 1956, 1957, 1960. It is also a crime to knowingly lease, rent, maintain, manage, or control a place where marijuana is manufactured or sold. 21 U.S.C. § 856. Leading a group of five or more people who commit a continuing series of federal marijuana crimes is an especially serious offense. Id. § 848. Also, attempting or conspiring to commit most of those crimes is also a criminal offense. See id. § 846; 18 U.S.C. §§ 1956(a)(1), 1956(h), 1957(a).

44. These criminal prohibitions on virtually every aspect of the marijuana business make the federal policy embodied in the CSA unmistakably clear: marijuana is a dangerous drug that is banned throughout the United States. Because RICO defines most violations of the CSA as "racketeering activity," see 18 U.S.C. § 1961(1)(D), any business engaged in the commercial cultivation and sale of marijuana is a criminal enterprise for purposes of federal law. Those who conduct or conspire to assist such enterprises are subject to the severe criminal sanctions and civil liability that RICO imposes. See id. § 1962(c), (d).

**Massachusetts Adopts a Licensing Regime That Promotes and Facilitates the Production and Distribution of Marijuana**

45. Despite the strict federal prohibitions on virtually every aspect of the commercial marijuana business, Massachusetts and many of its local jurisdictions, including the City of Cambridge and Town of Georgetown, have enacted marijuana licensing regimes that purport to authorize and seek to promote those federal crimes.

46. Since 2013, Massachusetts law has directed the Massachusetts Department of Public Health ("DPH") to issue licenses that purport to authorize qualifying "nonprofit medical marijuana treatment centers" "to acquire, process, possess, transfer, transport, sell, distribute, dispense, and administer marijuana for medical use." Mass. Gen. Laws ch. 94C §§ 1-9(B).  DPH also issues licenses that purport to authorize the cultivation of marijuana. *Id*.

47. To give effect and further the goals of this provision of Massachusetts law, DPH has promulgated regulations. 105 CMR 725.000, et seq. These regulations purport to expressly authorize the cultivation, distribution, and possession of marijuana. Thus, DPH's regulations speak of a registered marijuana dispensary (RMD), that "acquires, cultivates, possesses, processes . . . transfers, transports, sells, distributes, dispenses, or administers marijuana, products containing marijuana, related supplies, or educational materials to registered qualifying patients or their caregivers. . ." 105 CMR 725.000 purports to expressly authorize the cultivation, distribution, and possession of marijuana for medical users and specifies the circumstances under which a licensed RMD may sell marijuana or related products.

48. As of March 2017, nine (9) RMDs are open for retail sales in Massachusetts and an additional 88 are registered in various stages of completion.

49. Numerous other provisions of 105 CMR 725.000 contain similar statements purporting to authorize violations of the CSA.  *See, e.g.*, *id.* § 725.100(C)(1)(f) (A license applicant is prohibited from operating a licensed retail marijuana business without DPH approval); *id.* § 725.105(B)(2)(C) (An RMD may sell no more than 30% of its total on-hand inventory to another licensed Massachusetts RMD: "The distribution and acquisition of marijuana to and from all other RMDs does not exceed, cumulatively, 30% of the RMD's total annual inventory.").

50. In implementing the state's marijuana licensing regime and other marijuana regulations, DPH has described its mission to include creating ". . . ongoing collaboration with key stakeholders including RMDs, patients, physicians, advocacy groups and testing laboratories . . ."  On March 21, 2017, Monica Bharel, MD, MPH, the DPH Commissioner, pursuant to Section 2KKKK of Chapter 29 of the Massachusetts General Laws, filed the "Medical Marijuana Trust Fund Annual Report" that says that DPH seeks to ". . . expand internal capacity to successfully regulate the growing marijuana for medical use industry in the Commonwealth . . . [and] [w]ith the passage of the recreational use of marijuana ballot initiative in November 2016, the Program will collaborate with the State Treasurer's Office who is responsible for implementing the new law . . ."  In issuing marijuana business licenses, it is thus clear that the agency's overarching goal is to authorize, facilitate, and promote Massachusetts's marijuana industry.

51. Under 105 CMR 725.100, businesses may only cultivate and distribute marijuana for medical purposes if they obtain a DPH licenses authorizing them to do so.  To enable medical marijuana businesses to operate, DPH has a multi-step registration process for RMDs.  An RMD must also meet the general requirements of 725.100(A)(1-7), including, but not limited to:  required incorporation of the RMD as a M.G.L. c. 180 non-profit corporation, no executive, member or entity can own or control more than three (3) RMDs, all dispensary agents must be registered pursuant to 105 CMR 725.030 and have a program to provide reduced cost or free marijuana to patients with documented verified financial hardship; and at least one executive of the non-profit corporation must register with the Massachusetts Department of Criminal Justice Information Services (DCJIS) on behalf of the entity as an organization user of iCORI.

52. When DPH issues a medical marijuana license (i.e. certificate of registration for an RMD), it provides the business with a physical certificate that includes in large font the following text: **"Commonwealth of Massachusetts, Department of Public Health."** Under § 725.100(C)(2), "[n]o person shall operate a RMD without a certificate of registration issued by the Department [i.e. DPH]".  Moreover, "[a]cceptance of a certificate of registration, constitutes an agreement by the RMD that it will adhere to the practices, policies, and procedures that are described in its application materials, as well as all relevant laws, regulations, and any conditions imposed by the Department [DPH] as part of registration." *Id.* § 725.100(C)(5); and licensees "shall post the certificate of registration in a conspicuous location on the premises at each Department-approved location" *Id.* § 725.100(C)(6).  The prominent display of these licenses lends

the State's name and credibility to the licensee, thus functioning as a state endorsement that encourages others to do business with it.

53. 105 CMR 725.110 (Security Requirements for Registered Marijuana Dispensaries) requires RMD dispensary agents to wear state-issued badges while working in "limited-access areas"—anywhere that marijuana is grown, cultivated, stored, weighed, packaged, sold, or processed for sale.  *Id.* § 725.110(C); *see* 105 CMR 725.000 *definition* for "Registration Card": "Registration Card means an identification card issued by the Department to a registered qualifying patient, personal caregiver, or dispensary agent. The registration card verifies . . . that a dispensary agent has been registered with the Department and is authorized to work at a RMD."  These state-issued badges are at all times the property of state licensing authorities.  Like the physical licenses marijuana businesses must display, the occupational licensee badges encourage and condone potential marijuana investors and customers by prominently signaling the Commonwealth of Massachusetts's endorsement of the licensee.

54. Other provisions of the state regulations on medical marijuana allow DPH to limit production and the number of licenses it issues, but require it to consider "An analysis of the projected patient population and projected need in the service area of the proposed RMD" *id.* § 725.100(B)(3)(s). These considerations show that the overall aim of the state's licensing procedure is to facilitate and promote the cultivation and sale of marijuana.

55. To date, DPH has issued many medical marijuana licenses, and each of these licenses authorizes and facilitates the repeated and continuing commission of federal drug crimes.

22

56. Since enactment of the 2012 Act, the marijuana industry has experienced explosive growth in Massachusetts, and this growth would not have been possible without the Governmental Defendants' practice of licensing and endorsing federal drug crimes. Department of Justice enforcement guidance makes clear that non-enforcement of the CSA by the Executive Branch depends on the "states and local governments that have enacted laws authorizing marijuana-related conduct . . . implement[ing] strong and effective regulatory and enforcement systems." Thus, Massachusetts's marijuana laws and DPH's implementation of those laws are key components of the Massachusetts marijuana industry's success.

57. Predictably, the Commonwealth of Massachusetts Defendants' (i.e. including, City of Cambridge, Town of Georgetown, and DPH) efforts to promote the marijuana industry have yielded additional revenues for the Commonwealth. DPH records indicate that in Fiscal Year 2016 alone, a total of $7,227,356 in revenue was received, with the highest revenue stream including $4,170,000 from Phase 2 application fees. The Commonwealth is thus enriching itself by systematically authorizing, facilitating, and promoting serious federal drug crimes.

## THE CITY OF CAMBRIDGE AND TOWN OF GEORGETOWN DEFENDANTS FACILITATE THE PRODUCTION AND DISTRIBUTION OF MEDICAL MARIJUANA

58. Healthy Pharms filed a Special Permit Application with the City of Cambridge Planning Board on January 25, 2017 seeking a special permit to operate a RMD at 98 Winthrop Street (Unit 1) in Cambridge, MA pursuant to §§ 10.43 and 20.700 of the City of Cambridge Zoning Ordinance.

59. The City of Cambridge Planning Board granted the special permit request of Healthy Pharms by a decision that was filed with the Cambridge City Clerk on April 26, 2017.

Like DPH, the City of Cambridge Planning Board's practice was to issue special permits that purport to authorize the sale of medical marijuana.

60. The City of Cambridge Planning Board may deny a special permit for the operation of an RMD, in addition to failing to meet general criteria for the issuance of a special permit as set forth in Section 10.43 of the City of Cambridge Zoning Ordinance, based on the results of an investigation into whether or not "The Registered Marijuana Dispensary is located to serve an area that currently does not have reasonable access to medical marijuana, or if it is proposed to serve an area that is already served by other Registered Marijuana Dispensaries, it has been established by the Massachusetts Department of Public Health that supplemental service is needed." *See Notice of Decision* of the City of Cambridge Planning Board filed with the Cambridge City Clerk on April 26, 2017. Special permits issued by the City of Cambridge Planning Board authority thus encourage the marijuana industry's potential investors and customers by signaling that city officials have investigated the need for such a facility and the City permit authority endorses and condones the licensee's activities.

61. Like the 105 CMR 725.000, the City of Cambridge Zoning Ordinance expressly contemplates that City special permits authorize holders to participate in the commercial marijuana industry.  The City of Cambridge Zoning Ordinance in Article 2 defines a "Marijuana Dispensary, Registered"  as ". . . an establishment properly registered with the Massachusetts Department of Public Health under 105 CMR 725.100 that acquires, cultivates, possesses, processes (including development of related products such as edible marijuana infused products, tinctures, aerosols, oils, or ointments), transfers, transports, sells, distributes, dispenses, or administers marijuana,

24

products containing marijuana, related supplies, or educational materials to registered qualifying patients or their personal caregivers." *CITY OF CAMBRIDGE ZONING ORDINANCE 2-6,*

*http://www.cambridgema.gov/~/media/Files/CDD/ZoningDevel/Ordinance/zo_article_1382.ashx.*

62. The City of Cambridge has enjoyed additional revenue thanks to its efforts to authorize and facilitate the operations of the commercial marijuana industry. In addition to normal property tax revenue derived from property operating as a RMD, the City of Cambridge also received special permit application fees. The City of Cambridge has thus enriched itself by promoting, condoning, and facilitating violations of the CSA. Cambridge City Councilor Marc McGovern helped draft the new zoning ordinance to expand areas in the City of Cambridge where RMDs can operate, and told the Boston Globe that "…for the most part, this city [Cambridge] has come out overwhelmingly with support for medical marijuana dispensaries. You've got to put them somewhere, and Harvard Square is a good a place as any." Steve Annear, *Harvard Square Medical Marijuana Dispensary Gets Closer to Reality* (Boston Globe, March 09, 2017), https://www.bostonglobe.com/metro/2017/03/09/medical-marijuana-nonprofit-clears hurdle-bring-dispensary-harvard-square/Kv5gOpzp9MxstZMgKna5PL/story.html. Moreover, Cambridge City Solicitor Nancy Glowa has described the rise of the marijuana industry in Massachusetts: "It does appear the framers of the ballot petition [for recreational marijuana in Massachusetts] were very interested in having ample access to places to buy recreational marijuana." Marc Levy, *Prospect of Law for Recreational Marijuana Makes Councillors Hesitate on Medical Use* (October 18,

2016, Cambridge Day), http://www.cambridgeday.com/2016/10/18/prospect-of-law-for-recreational-marijuana-makes-councillors-hesitate-on-medical-use/. Such statements underscore that, like Massachusetts, the City of Cambridge has sought to enrich itself by authorizing and seeking to assist the operations of the RMDs, to which it issues special permits.

63. By issuing special permits to operate RMDs, the City of Cambridge Defendants authorize and condone criminal conduct that the CSA prohibits. In addition to authorizing federal crimes, the City of Cambridge Defendants' practice of issuing special permits to RMDs facilitates, condones, and promotes those crimes by assisting potential marijuana investors and customers in their search for marijuana businesses.

64. The Town of Georgetown defendants similarly issued permits for the marijuana cultivation facility to operate at 401 East Main Street, Georgetown, MA. In addition, Healthy Pharms' host agreement with the Town of Georgetown requires Healthy Pharms to pay the Town $100,000 plus 2.5 percent of gross retail sales revenue over $4,000,000 during the first year of operation. In the second year, Healthy Pharms will pay the Town of Georgetown $150,000 and 3 percent of gross retail sales. In the third year and consecutive years after that, the Town of Georgetown will receive $200,000 and 3 percent of gross retail sales. Moreover, Healthy Pharms has also agreed in their host agreement with the Town of Georgetown to try to hire qualified Georgetown residents and use local vendors when possible. It will also pay property taxes, despite ostensibly operating as a non-profit. The Town of Georgetown has enjoyed substantial economic benefits thanks to its efforts to authorize and facilitate the illegal operations of the commercial marijuana industry.

**THE NON-GOVERNMENTAL DEFENDANTS, THE CITY OF CAMBRIDGE, AND THE TOWN OF GEORGETOWN DEFENDANTS FORM AN ASSOCIATION-IN-FACT ENTERPRISE DEDICATED TO THE CULTIVATION AND DISTRIBUTION OF MARIJUANA**

65. Upon information and belief, the owner of the real estate at 98 Winthrop Street in Cambridge, MA (where Healthy Pharms is located) is Timbuktu. The lease between Timbuktu and Healthy Pharms appears to be an abnormally high rental and far in excess of a fair rental value for such limited space and square footage. In addition, the lease for the RMD by Healthy Pharms indicates that the owner is obligated to buy-out the existing tenant, Tomolly, with a one million dollar ($1,000,000.00) buyout. A check of the records of the Secretary of the Commonwealth shows that Paul Overgaag is the sole officer and director of Tomolly. Upon information and belief, this evidences a conflict of interest in violation of the DPH non-profit regulations, 105 CMR 725.100(A)(1) and the DPH "Guidance for Registered Marijuana Dispensaries Regarding Non-Profit Compliance" updated on May 15, 2015.

66. Timbuktu leased 98 Winthrop Street to Healthy Pharms, which grows marijuana at 401 East Main Street, Georgetown, MA with the purpose to sell marijuana at 98 Winthrop Street.

67. Leasing or maintaining property for the cultivation of marijuana is a crime under 21 U.S.C. § 856 and is racketeering activity under 18 U.S.C. § 1961(1)(D).

68. Healthy Pharms, Nathaniel Averill, Paul Overgaag, and Timbuktu also conspired and agreed to work together to develop the property at 98 Winthrop Street and 401 East Main Street, Georgetown, MA for marijuana sale and cultivation respectively, and to contribute to the ongoing violations of the CSA inherent in those operations. Entering

27

into such an agreement is conspiracy under 21 U.S.C. § 846 and is racketeering activity under 18 U.S.C. § 1961(1)(D).

69. To enable Healthy Pharms to grow marijuana at 401 East Main Street, Healthy Pharms constructed facilities specially designed for marijuana cultivation.  This building has water and security systems custom built for growing marijuana.  On information and belief, the building also accommodates the processing and drying of marijuana.  The building at 401 East Main Street, Georgetown, MA is, upon information and belief, several thousand square feet, and houses as many as several hundred marijuana plants at one time.  Upon information and belief, this building is owned by 3 Brothers. Moreover, Healthy Pharms and Timbuktu have taken active steps to prepare 98 Winthrop Street for use as a marijuana distribution facility, including seeking to engage a contractor to make alterations to the property. Possessing or constructing these facilities, equipment, products, and materials for the cultivation and processing of marijuana violates 21 U.S.C. § 843(a)(6) and is racketeering activity under 18 U.S.C. § 1961(1)(D).

70. The marijuana cultivation facility at 401 East Main Street, Georgetown, MA is currently operational, a fact that is evident from the offensive marijuana smell that the facility has repeatedly released onto its neighbors' land.  Healthy Pharms manufacture of marijuana and possession of marijuana with the intent to distribute it violates 21 U.S.C. § 841(a) and is racketeering activity under 18 U.S.C. § 1961(1)(D).

71. On information and belief, Healthy Pharms, Timbuktu, 3 Brothers, Nathaniel Averill, and Paul Overgaag used the telephone, email, or other communication facilities to take steps in furtherance of their efforts to unlawfully lease the 401 East Main Street,

Georgetown, MA and 98 Winthrop Street, Cambridge, MA properties and develop

them.  Such uses of communication facilities violate 21 U.S.C. § 843(b) and are

racketeering activity under 18 U.S.C. § 1961(1)(D).

72. Healthy Pharms applied for both state and local licenses/permits to cultivate marijuana

at 401 East Main Street, Georgetown, MA.  On March 8, 2017, the State approved

Healthy Pharms to commence retail sales of marijuana to registered qualifying patients

and personal caregivers.   Through counsel, Healthy Pharms has notified plaintiffs that

it intends to proceed with its plans to construct and operate an RMD at 98 Winthrop

Street.

73. On February 28, 2017, the City of Cambridge Planning Commission voted 6 to 1 to

grant Healthy Pharms a special permit to open an RMD at 98 Winthrop Street.

74. Healthy Pharms paid all necessary filing and special permit fees to the City of

Cambridge.

75. Healthy Pharms paid DPH the necessary application and licensing fees.

76. In exchange for the ongoing payment of licensing fees, Healthy Pharms and the other

Non-Governmental Defendants receive critical benefits from the City of Cambridge

and DPH defendants. First, the City of Cambridge special permit and DPH license

effectively shields the Non-Governmental Defendants from state and possible federal

prosecution. As described above, Massachusetts law authorizes the cultivation of

medical marijuana and recreational marijuana. Similarly, the United States Department

of Justice, to date, has adopted a policy, based on a lack of budgetary resources, of not

bringing criminal charges against those who commit marijuana-related drug crimes in a

manner that is consistent with state and local law. Thus, Healthy Pharms's licensing

fees function as a payment to the DPH and the City of Cambridge for official protection for their illegal drug business under the CSA. This protection is essential to the Non-Governmental Defendants' ability to openly violate the federal drug laws through large-scale cultivation and storefront sale of marijuana.

77. The Non-Governmental Defendants also benefit from the DPH license and special permit that the City of Cambridge Defendants and DPH issued that allows them to carry out their goal of operating an RMD at 98 Winthrop Street, because it gives their illegal drug business an appearance of greater legitimacy, thus making it easier to attract customers and investors.  The special permit is proof of the local government's authorization, endorsement, and support for the Non-Governmental Defendants' criminal operations; and this encourages others to do marijuana-related business with the Non-Governmental Defendants.  Significantly, the Non-Governmental Defendants' investors and customers themselves commit federal drug crimes when they do marijuana-related business with the Non-Governmental Defendants.

78. If the special permit left any doubt about the City of Cambridge Defendants' support for Healthy Pharms, the public statements of City of Cambridge officials heretofore identified make clear that the City of Cambridge Defendants' official policy is to join with, condone, and facilitate commercial marijuana conspiracies that operate within their jurisdiction.  Such public statements help the Non-Governmental Defendants attract investors by giving assurance that Healthy Pharms has the support of the local government despite the fact that it is engaged in a manifestly unlawful business under federal law.

79. In agreeing to develop and assist in the operations of the marijuana cultivation facilities at 401 East Main Street, Georgetown, MA and 98 Winthrop Street, Cambridge, MA, Nathaniel Averill, Paul Overgaag, Timbuktu, 3 Brothers, and Healthy Pharms conspired to violate the federal drug laws and commit a pattern of racketeering activity. By and through Healthy Pharms, Timbuktu, and 3 Brothers, Nathaniel Averill and Paul Overgaag operate a marijuana cultivation facility in Georgetown, MA and are preparing to open a dispensary at 98 Winthrop Street, Cambridge, MA.  Both the Georgetown and City of Cambridge operations violate numerous provisions of the CSA: maintaining the premises violates 21 U.S.C. § 856, growing, processing, and selling marijuana there violates 21 U.S.C. § 841(a), and maintaining the necessary chemicals, equipment, and materials violates 21 U.S.C. § 843(a)(6).  On information and belief, Healthy Pharms, Timbuktu, 3 Brothers, Nathaniel Averill, and Paul Overgaag have used the telephone, email and other communications facilities in furtherance of their drug conspiracy, thus violating 21 U.S.C. § 843(b).  Each of those federal drug crimes is racketeering activity under 18 U.S.C. § 1961(1)(D).

80. The Healthy Pharms cultivation facility is located at 401 East Main Street, Georgetown, MA, and this property is owned by Healthy Pharms.  One of Healthy Pharms' planned dispensary locations is located at 98 Winthrop Street, Cambridge, MA. Timbuktu and Healthy Pharms entered into a lease under which it was expressly agreed that Healthy Pharms would use the property to sell marijuana. 3 Brothers also entered into a lease with Healthy Pharms for the Georgetown cultivation facility.  Healthy Pharms, Timbuktu, 3 Brothers, Nathaniel Averill, and Paul Overgaag thus violated 21 U.S.C. § 856 and conspired to violate the CSA in violation of 21 U.S.C. § 846.

81. Healthy Pharms advertises marijuana for sale over the Internet in violation of 21 U.S.C. § 843(c)(2)(A), and this is racketeering activity under 18 U.S.C. § 1961(1)(D).  A posting to Facebook by Healthy Pharms, publishes the location of their facilities. Elsewhere on the Facebook page, there are numerous customer reviews, one by Brian DeMatteo ". . . I have been to 5 dispensaries and this is the best one by "phar". The biggest reason is they treat you as a patient in need of the wonders of Marijuana. I like the modern farm/pharm feel of the place. .." https://www.facebook.com/pg/healthypharms/reviews/?ref=page_internal. Moreover, a post by Healthy Pharms on July 6, 2017 at 8:58 AM shows a picture of a tiramisu marijuana edible and states "Perks of having a chef on staff. . . tiramisu shows up at your employee barbecue! "High" 5 to James for winning the potato salad contest with his loaded baked potato version!" Moreover, on July 3, 2017 at 11:58am, Healthy Pharms has a post that clearly advertises their products: "Our featured strain this week is Critical Plus 2.0! Patients can enjoy 10% off up to 14 grams now through Sunday, July 9th. *Discount cannot be combined with any other offer or discount * only valid through 7/19/17 *can only be applied to loose flower *not applicable on pre rolls, concentrates or edibles * while supplies las #criticalplus #indicia #pharmfresh." Furthermore, on June 30, 2017 at 11:24 AM, Healthy Pharms posted "Announcing more new items on the Pharm menu! 1 gram and .5 gram packages of shatter now available! Open 12-7 every day!" With that post, there was also a picture of the packaging and test results for the product that indicate they had a "Pass" rating. In addition, on May 31, 2017, Healthy Pharms also posted "Lozenges are back in stock! View our menu on our website under products!

http://www.healthypharms.org/products/." Lastly, the Healthy Pharms website

(http://www.healthypharms.org/products/) clearly advertises marijuana products for

sale. Clicking on their products page, there is an extensive listing of the cannabis

products: "Healthy Pharms will carry an extensive inventory of top-quality medical

cannabis products ranging from flowers to accessories like rolling papers, lighters,

grinders, glass pipes, and vape batteries. We work with our professional growers to

cultivate top-shelf indica, sativa, and hybrid strains and specialize in developing highly

effective CBD strains. Healthy Pharms will also be vertically integrating our line of

connoisseur quality concentrates extracted from premium in-house cannabis strains. We

will also carry vape cartridges that are formulated to target and alleviate symptomatic

discomforts."

82. Pursuant with clause 8(c)(Insurance) of the Healthy Pharms lease with Timbuktu,

"Tenant [Healthy Pharms], at its own expense, shall provide and keep in force with

companies acceptable to landlord, liability insurance coverage for no less than

$1,000,000 per occurrence and $2,000,000 in aggregate, annually, pursuant to the

requirements in 105 CMR 725.105(0). Tenant will make reports documenting

compliance with 105 CMR 725.105(0) in a manner and form determined by the

Massachusetts Department of Public Health Pursuant to 105 CMR 725.105(M)." Upon

information and belief, Healthy Pharms, Timbuktu, 3 Brothers, Red Line, and their

respective officers, directors, managers, investors, assigns, nominees, and/or affiliated

persons, continue to enjoy an insurance relationship with John Does 1, 2, 3, and 4.

Upon information and belief, John Does 1, 2, 3, and 4 issued insurance policies with the

intent to further Healthy Pharms, Timbuktu, 3 Brothers, Red Line, and their respective

33

officers, directors, managers, investors, assigns, nominees, and/or affiliated persons to commit crimes under the CSA in violation of 21. U.S.C. § 846. That is racketeering activity under 18 U.S.C. § 1961(1)(D).

83. Upon information and belief, Healthy Pharms continues to enjoy a banking relationship with Century Bank in Massachusetts, a state chartered bank in Massachusetts, as most, if not all, federally chartered banks in Massachusetts will not loan money to an RMD or accept deposits on their behalf. According to the June 8, 2015 Town of Georgetown Board of Selectmen Meeting Minutes, "Mr. [Nathaniel] Averill stated that they [Healthy Pharms] will mostly deal with cash and in the future debit cards and credit cards. Atty. Romano [on behalf of Healthy Pharms] stated that the banks pulled out as a lot of restrictions from the federal government. [Atty. Romano] stated that Century Bank has accepted Healthy Pharms as a client and they are working with them." Moreover, "Atty. Romano stated that the State has vetted the company, and they have been through the Department of Public Health, and working with Century Bank." Century Bank knew and intended for Healthy Pharms to use the funds deposited in its bank account(s) to operate a marijuana business in violation of the CSA. By entering into a banking relationship with Healthy Pharms, Century Bank conspired with Healthy Pharms, Nathaniel Averill, and Paul Overgaag to commit crimes under the CSA in violation of 21 U.S.C. § 846.  That is racketeering activity under 18 U.S.C. § 1961(1)(D). Moreover, financial transactions involving proceeds generated by marijuana-related conduct can form the basis for prosecution under the money laundering statutes (18 U.S.C. §§ 1956 and 1957), the unlicensed money transmitter statute (18 U.S.C. § 1960), and the Bank Secrecy Act (BSA). Sections 1956 and 1957

of Title 18 make it a criminal offense to engage in certain financial and monetary

transactions with the proceeds of a "specified unlawful activity," including proceeds

from marijuana-related violations of the CSA. Transactions by or through a money

transmitting business involving funds "derived from" marijuana-related conduct could

face criminal liability under the BSA for, among other things, failing to identify or

report financial transactions that involved the proceeds of marijuana-related violations

of the CSA. See, e.g., 31 U.S.C. §5318(g). Notably for these purposes, prosecution

under these offenses based on transactions involving marijuana proceeds does not

require an underlying marijuana-related conviction under federal or state law. See

James M. Cole, Memorandum for All United States Attorneys, Subject: Guidance

Regarding Marijuana Related Financial Crimes (February 14, 2014).

84. The Non-Governmental Defendants, the City of Cambridge, and the Town of

Georgetown formed an association-in-fact enterprise for the purposes of cultivating

marijuana at 401 East Main Street, Georgetown, MA and selling it through Healthy

Pharms dispensaries.  To that end, they pooled their resources, knowledge, skills, and

labor to achieve through the enterprise efficiencies in the cultivation and distribution of

marijuana that none of them could have achieved individually.

85. All of the Non-Governmental Defendants have contractual and other relationships with

each other and are collaborating together to contribute to the association-in-fact

enterprise's efforts to cultivate marijuana at 401 East Main Street, Georgetown, MA,

and thereby engage in an ongoing pattern of racketeering activity.  Healthy Pharms,

Timbuktu, Nathaniel Averill, and Paul Overgaag all participated in the agreement as

part of which Healthy Pharms leased the 98 Winthrop Street, Cambridge, MA property

for dispensing marijuana.  Healthy Pharms, 3 Brothers, Nathaniel Averill, and Paul Overgaag participated in the real estate transaction for the cultivation facility located at 401 East Main Street, Georgetown, MA. The City of Cambridge and Town of Georgetown Defendants issued permits for Healthy Pharms on the strength of an application that identifies most of the Non-Governmental Defendants and discloses the group's plans to grow marijuana at 401 East Main Street, Georgetown, MA and dispense at 98 Winthrop Street, Cambridge, MA respectively.  And regardless of whether Century Bank, and John Does 1, 2, 3, and 4, knew the *identities* of all of its coconspirators, upon information and belief, they were aware that *someone* was performing the essential roles of their coconspirators in furtherance of the enterprise's criminal activities.

86. On information and belief, most decisions about how the properties at 401 East Main Street, Georgetown, MA and 98 Winthrop Street, Cambridge, MA are developed and used are made collectively by Healthy Pharms, Timbuktu, 3 Brothers, Nathaniel Averill, and Paul Overgaag, with each having an important role in decision-making, operations, and management.

87. Upon information and belief, Defendants Nathaniel Averill, Paul Overgaag, 3 Brothers, Red Line, Timbuktu, and Healthy Pharms play central roles in the management and operations of the association-in-fact enterprise.  Acting on behalf of the enterprise, Paul Overgaag who owned the property at 98 Winthrop Street through Tomolly, sold the property to Timbuktu, which in turn leased said property to Healthy Pharms.  The Board of Selectmen of the Town of Georgetown considered Healthy Pharm's permit application for operation of the cultivation facility at 401 East Main Street,

Georgetown, MA at a June 8, 2015 hearing.  Nathaniel Averill and Paul Overgaag

spoke at the hearing in support of the application, describing themselves as the

operators of Healthy Pharms.

88. Upon information and belief, Healthy Pharms, Red Line, Nathaniel Averill, and Paul

Overgaag also have important roles managing the enterprise's affairs.  Healthy Pharms

applied for and holds the state and local permits that authorize cultivation of marijuana

at 401 East Main Street, Georgetown, MA and dispensary operations at 98 Winthrop

Street, Cambridge, MA.  As significant owners in Healthy Pharms, Nathaniel Averill

and Paul Overgaag completed and signed those applications and make decisions about

Healthy Pharms' finances and business strategy.

89. All of the Non-Governmental Defendants agreed to participate in and assist the

enterprise with full knowledge of its overall aim of growing and selling marijuana.  As

set forth above, that goal could only be accomplished through numerous violations of

the CSA.  Each such violation of the CSA is racketeering activity, and all of the Non-

Governmental Defendants thus knew, or should have known, and intended that in

agreeing to assist the enterprise they would help it carry out a pattern of racketeering

activity.

**THE NON-GOVERNMENTAL DEFENDANTS' MARIJUANA OPERATIONS INJURE
PROPERTY OWNED BY CRIMSON GALERIA LIMITED PARTNERSHIP,  RAJ &
RAJ, LLC, HARVARD SQUARE  HOLDINGS LLC, AND CHARLES RIVER
HOLDINGS LLC**

90. RAJ & RAJ  is the owner of the commercial real property located at 96 Winthrop

Street, Cambridge, MA, which abuts 98 Winthrop Street, Cambridge, MA to the East.

91. Charles River Holdings is the owner of the commercial real property located at 16-18
    Eliot Street, Cambridge, MA, which abuts 98 Winthrop Street, Cambridge, MA to the
    South.

92. Harvard Square Holdings LLC is the owner of the commercial real property located at
    52 and 54 JFK Street, Cambridge, MA, which are within approximately 200 feet of 98
    Winthrop Street, Cambridge, MA.

93. Crimson Galeria is the owner of the commercial real property located at 57 JFK Street,
    Cambridge, MA, which is located within approximately 200 feet of 98 Winthrop Street,
    Cambridge, MA.

94. The purpose of the building at 98 Winthrop Street—the manufacture of illegal drugs—
    materially and substantially diminishes the market value and interferes with the use and
    enjoyment of Plaintiffs' properties by Plaintiffs and their tenants. The sale of marijuana
    is a stigmatized activity, and when tenants and others visit Plaintiffs' properties, they
    are reminded of the nearby racketeering enterprise.

95. Marijuana is an extremely odorous plant that emits a distinctive, skunk-like smell that
    is particularly strong when the plant is harvested. These smells will purportedly disrupt
    commercial tenants and interferes with the neighboring owners' use and enjoyment of
    their property, and significantly diminishes the property's value. The Plaintiffs retained
    Webster A. Collins, MAI, CRE, FRICS as a real estate appraiser in this matter. Part of
    his assignment involved a site visit to a competing RMD located in Brookline, MA. Mr.
    Collins noted odors of marijuana outside the Brookline, MA RMD. *See* Exhibit 1, p. 74.
    Winthrop Street is a narrow, historic, and essentially a walking street in the Harvard

Square area of Cambridge. 98 Winthrop Street is a significant building in the Harvard

Square Historic District in Cambridge.

96. The dispensary at 98 Winthrop Street, Cambridge, MA is located immediately adjacent

(i.e. connected) in the same building as a restaurant with a full liquor license (The Red

House), which restaurant will be reduced in size, and remain the front part of the

building along with the Red House Oyster Bar, with the RMD located in the rear. In the

Healthy Pharms RMD applicant proposal, it stated that they would continue operating

the Redhouse Restaurant and Charlie's Kitchen and Beer Garden, which all share a

liquor license. These businesses are also commingled with deliveries and staffing.

Having an RMD at 98 Winthrop Street results in a Change of Premises, which can only

be authorized by the Cambridge Licensing Commission and the Alcoholic Beverage

Control Commission ("ABCC"). The City of Cambridge Planning Board should not

have issued the special permit until the Change in Premises had been approved by the

Cambridge Licensing Commission and the ABCC. See M.G.L. c. 138, §§ 15A and

16B. Healthy Pharms has never provided a method or plan for ensuring that patrons of

the aforementioned restaurants do not mix marijuana and alcohol consumption, a

dangerous combination and potential hazard to the public.

97. The Non-Governmental Defendants' publicly disclosed drug conspiracy has also

injured the value of the neighboring, non-abutting property of the Plaintiff's.  People

buy property and rent in Plaintiffs' buildings because they want to operate their

businesses in a pleasant and historic area, and the Plaintiffs' land is less suitable for

those uses due to the 98 Winthrop Street dispensary.  Furthermore, the large quantity of

drugs at marijuana dispensaries are targets for theft, and a prospective buyer or renter of

the Plaintiffs' properties would reasonably worry that the 98 Winthrop Street, Cambridge, MA dispensary increases crime in the area.  Prospective buyers would also object to the 98 Winthrop Street, Cambridge, MA dispensary because it will purportedly emit pungent odors, similar to the Brookline, MA RMD, thus further interfering with the use and enjoyment of the Plaintiffs' Property.  As a result, the 98 Winthrop Street, Cambridge, MA marijuana dispensary has directly and proximately caused a substantial diminution in the market value of the Plaintiffs' Property and made it more difficult to sell or rent.  Moreover, the RMD at 98 Winthrop Street has prevented realization of a development scheme that would bring Plaintiffs' properties to their highest-and-best use.

98. The Non-Governmental Defendants could not have located their marijuana dispensary operation at 98 Winthrop Street if they had not received authorization from the State and City of Cambridge to do so.  Indeed, they did not begin construction on the facilities at 98 Winthrop Street until the State, Town of Georgetown, and City of Cambridge Defendants authorized them to grow marijuana at the Georgetown cultivation facility, and allow the sale of marijuana at the 98 Winthrop Street RMD. Thus, the State, Town of Georgetown, and City of Cambridge Defendants have also caused the Plaintiffs to suffer substantial injuries.

99. To document and substantiate their injury allegations, Plaintiffs engaged Webster A. Collins, MAI, CRE, FRICS to provide an expert opinion on the market value of the Plaintiffs' Property and the consequences thereof of having an RMD abutting or in close proximity.  Mr. Collins, Executive Vice President/Partner of CB Richard Ellis/New England Partners ("CBRE"), has over forty years of experience in the

Massachusetts real estate market, especially in the City of Cambridge, and he specializes in real estate transactions involving properties like the ones the Plaintiffs own.  CBRE is the world's largest real estate services firm with some 350 offices worldwide, over $11 Billion in gross revenue, and over 80,000 employees. Mr. Collins is a respected and well accomplished real estate appraiser, real estate counselor, and specializes in the sale of investment property in Massachusetts. Mr. Collins has analyzed over $35 billion dollars in property.  He is a member of Appraisal Institute (MAI) and Past President of the New England Chapter. He earned a Masters of Business Administration (MBA) from Boston University in 1961. He has appraised over 80 million square feet of office space, over 40 million square feet of industrial space, over 25 million square feet of retail, over 25,000 apartment units, over 10,000 hotel rooms, and over 100 boatyards throughout New England. He is a licensed and certified real estate appraiser in Massachusetts, Maine, New Hampshire, Rhode Island, New York, and on a temporary basis in other locations where clients own property. In his nearly 40 years of practice, he has completed over 6,000 reports involving over 180 million square feet of property.

100.    As part of real estate appraisal standards of practice, Mr. Collins visited and inspected the Plaintiffs' property and 98 Winthrop Street, including the location of the RMD.  He interviewed leasing brokers and the leasing agents for the impacted properties.  He learned that brokers must report to any potential tenant that a marijuana dispensary is to be located at 98 Winthrop Street.  He learned that when discussions of this type take place, tenants were "just not comfortable." He learned from the interview

process that the level of rent goes down, the quality of the tenant goes down, and

tenants do not want to locate there.

101.    Based on Mr. Collins's investigation, his expert opinion is that the Plaintiffs'

property would be substantially diminished in value and be much more difficult to sell

and lease. Exposure times are typically 6 months in the Harvard Square market. With

the introduction of a use that impacts property marketability, exposure times are

uncertain. Mr. Collins opines that Harvard Square is one of the top retail locations in

the United States and on an impaired basis, there would be a significant loss in property

value as a direct and proximate result of a marijuana dispensary locating nearby.  In the

real estate business, property owners are entitled to develop their properties as zoned to

their highest and best use.  For 16-18 Eliot Street, approvals are in place to add 3 floors

which would contain 15 apartment units.  For 57 JFK Street, approvals are in place to

add 3 floors and 16,889 rentable square feet of class A office space. These

developments with the presence of the RMD are on hold.  Banks and investors will not

finance the respective projects due to Defendants' actions.

102.    Mr. Collins's expert opinion is that a marijuana dispensary is no different than a

drug and alcohol treatment center, where paired sales analysis indicated major losses in

value when property is directly adjacent thereto. Mr. Collins' opinion is that the adverse

effects of "stigma" also apply to single family residential housing in Harvard Square.

Within .5 miles of 98 Winthrop Street market statistics indicate that there are 909

owner occupied housing units.  Mr. Collins' opinion was based on speaking with

investors who own property directly within the area. Based on his study of this issue, it

was apparent that knowledgeable investors have a strong negative reaction, which

directly translates to how prospective buyers would react to a marijuana dispensary. It was Mr. Collins' expert opinion that parallels can be drawn with environmental stigma and the dangers to human health that peaked in the 1990s and directly translated into major losses in property values. Marijuana dispensaries are a stigmatized activity that diminishes surrounding property values.

103.    Further buttressing the same conclusion is the fact that leading authorities on property appraisal recognize that persistent foul odors reduce the market value of property. APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 635 (14th ed. 2013) (explaining how appraisal should account for "external obsolescence" by providing example of apartment building that has diminished value because it is downwind from odorous asphalt plant); Michael Wolff, *Estimating the Value of an Odor and Noise Easement*, RIGHT OF WAY 38–41 (2012), https://goo.gl/uRKS1e (case study describing appraisal methodology for estimating impact of odorous sewage treatment plant on nearby property values and finding that facility has significant impact on value of nearby buildable land). Similar authorities also support the proposition that stigmatized activities reduce nearby property values. *See, e.g.*, JAMES H. BOYKIN, LAND VALUATION: ADJUSTMENT PROCEDURES AND ASSIGNMENTS 203.

104.    Extensive evidence shows that marijuana retail sale is an odorous and stigmatized activity and that foul smelling, stigmatized activities reduce nearby property values. In light of this evidence, it is clear that Defendants' operation of a marijuana dispensary at 98 Winthrop Street, Cambridge, MA diminishes the market value of Plaintiffs' abutting and nearby properties all to the damage of Plaintiffs

105.    Plaintiffs hereby incorporate by reference the conclusions in the report of Webster

A. Collins dated August 30, 2017 attached hereto as Exhibit 1 to this complaint to

substantiate in part their standing and claim for damages.

**THE STATE AND CITY OF CAMBRIDGE DEFENDANTS' ISSUANCE OF
MARIJUANA LICENSES/PERMITS POSES AN IMMINENT RISK OF HARM TO
CHILDREN AND SUSCEPTIBLE YOUTH; THE CITY OF CAMBRIDGE ZONING
ORDINANCE LOWERING THE BUFFER ZONE TO 250 FEET ENDANGERS
CHILDREN IN VIOLATION OF FEDERAL LAW.**

106.    The Garden Nursery School is a preschool located at 24A Farwell Place in

Harvard Square, and is within 1000 feet of 98 Winthrop Street.

107.    The New England School of English ("NESE") (http://nese.com/index.html)

provides English language programs, dormitories for students, and is located at 36 JFK

Street #3 and is located within 1000 feet of 98 Winthrop Street.

108.    A Sunday School program distinctly oriented toward children is operated at 66

Winthrop Street by the University Lutheran Church, approximately 300 feet away from

98 Winthrop Street.

109.    Various facilities and entities of Harvard University are located within 1000 feet

of 98 Winthrop Street.

110.    The Newtowne School (http://newtowneschool.org/), a Reggio-Emilia-inspired

parent cooperative preschool for children ages 22 months to 5 years, is located at 11

Garden Street and is within 1000 feet of 98 Winthrop Street.

111.    While federal law regards the sale of marijuana within 1000 feet of a school as an

especially serious crime, the City of Cambridge only recognizes a 250 foot buffer

zone—half of the default buffer zone established by DPH. Such a limited buffer zone

endangers the health, safety, and general welfare of children.

112.     On August 31, 2016, the Ordinance Committee of the City of Cambridge held a

public hearing to discuss a zoning petition by Healthy Pharms to amend Section 20.700

(Medical Marijuana Overlay Districts) by creating an additional Medical Marijuana

Overlay District (MMD-4). RMDs in the City of Cambridge can be no less than 250

feet, instead of the state-standard 500 feet, distant from a school, daycare center,

preschool or afterschool facility or any facility in which children commonly

congregate, or closer, only if it determined by the City of Cambridge Planning Board to

be sufficiently buffered such that users will not be adversely impacted by the operation

of the dispensary. In the Meeting Minutes for the Ordinance Committee of the City of

Cambridge, "[A Healthy Pharms representative] spoke about the regulation regarding

the location of a RMD proximity to schools or other facility where children congregate.

He stated that Lutheran Universal Church has a Sunday school located 300 feet from

the facility [98 Winthrop Street]. Healthy Pharms on page 19 of their Powerpoint

presentation (or page 24 of the Committee Meeting Minutes) states "[Healthy Pharms]

will be located about 300' away from a church with Sunday School." On Planning

Board Minutes page 25, PowerPoint presentation, page 21, "Due to the density in

Harvard Square and the Sunday School at UniLu, [Healthy Pharm's] zoning petition

calls for the 500' setback to be reduced to 250'." In a letter from Jeff Roberts, Land Use

and Zoning Planner to the Planning Board on August 9, 2016 at page 6, Ordinance

Committee Minutes, p. 42 "The Petition [of Healthy Pharms] proposes reducing the

required buffer from facilities with programming for children from 500 to 250 feet. The

map prepared by CDD shows that most of the district is outside the 500-foot buffers,

although it is possible that this map does not include every use that may possibly fall

under the MDPH definition for such a facility. **The petitioners' rationale for why 250 feet is a more appropriate buffer distance than 500 feet should be more fully explained."** **(Emphasis added)**. The reduced change from the federal 1000 foot buffer to the 500 foot DPH buffer and the City of Cambridge 250 buffer in certain districts within Harvard Square bears no rational relationship to the public good.

## CLAIMS FOR RELIEF

### RICO COUNTS
### COUNT I
### Violation of 18 U.S.C. § 1962(c)
### Against Healthy Pharms, Timbuktu, 3 Brothers, Red Line, Nathaniel Averill, and Paul Overgaag

113.    Plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

114.    RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c).  Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Healthy Pharms, Timbuktu, Nathaniel Averill, 3 Brothers, Red Line, and Paul Overgaag each violated this provision of 18 U.S.C. § 1962.

115.    The Non-Governmental Defendants, together with the City of Cambridge and Town of Georgetown, formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) by establishing contractual and other relationships with each other, collaborating to develop the 401 East Main Street, Georgetown, MA property for

marijuana cultivation and the 98 Winthrop Street, Cambridge, MA property for a retail dispensary, as well as agreeing to sell that marijuana to RMDs throughout Massachusetts.  This enterprise enables the Defendants to more efficiently achieve their collective purpose.

116.    Funding, goods, and services procured by the enterprise have moved in interstate commerce, and the enterprise purportedly advertises and intends to sell marijuana in interstate commerce.

117.    Healthy Pharms, Nathaniel Averill, Timbuktu, 3 Brothers, Red Line, and Paul Overgaag each have some part in directing the enterprise's affairs.  Healthy Pharms, by and through its owners Nathaniel Averill and Paul Overgaag, applied for licenses to operate a cultivation facility at 401 East Main Street, Georgetown, MA and a RMD at 98 Winthrop Street, Cambridge, MA; and they, upon information and belief along with Red Line, collectively manage the properties where the resulting marijuana is sold or to be sold.  Timbuktu owns the property on which the marijuana is to be sold at 98 Winthrop Street, Cambridge, MA, and through Paul Overgaag, it makes decisions about the design and operation of the building and the enterprise's overall finances.  3 Brothers owns the property where marijuana is cultivated for use by Healthy Pharms. At the Town of Georgetown hearing that considered Healthy Pharms's application for a local license/permit to grow marijuana at 401 East Main Street, Georgetown, MA, and during the proceedings to obtain a Special Permit from the City of Cambridge to operate a RMD at 98 Winthrop Street, Cambridge, MA, both Nathaniel Averill and Paul Overgaag spoke on behalf of the enterprise.

118.     Healthy Pharms, Timbuktu, 3 Brothers, Red Line, Nathaniel Averill, and Paul

Overgaag have each conducted or participated in the conduct of the affairs of the

enterprise through a pattern of racketeering activity.  They collectively entered into a

lease(s) under which Healthy Pharms has been purportedly used to commit numerous

crimes under the CSA, and that lease(s) violates 21 U.S.C. § 856.  They also conspired,

in violation of 21 U.S.C. § 846, to work together with the other members of the

enterprise for the success of Healthy Pharms's open-ended illegal marijuana business.

On information and belief, they used communication facilities to enter into their lease

and their drug conspiracy in violation of 21 U.S.C. § 843(b).  Healthy Pharms,

Nathaniel Averill, and Paul Overgaag possess materials, goods, and facilities for the

manufacture of marijuana in violation of 21 U.S.C. § 843(a)(6).  All of those crimes are

racketeering activity under 18 U.S.C. § 1961(1)(D).

119.     The racketeering activities of Healthy Pharms, Timbuktu, 3 Brothers, Red Line,

Nathaniel Averill, and Paul Overgaag have directly and proximately damaged the

Plaintiffs' property, including, but not limited to the substantial diminution in its market

value, and making it more difficult to sell or lease the Plaintiffs' properties, all to the

damage of the Plaintiffs.

**COUNT II**
**Violation of 18 U.S.C. § 1962(d)**
**Against All Non-Governmental Defendants**

120.     Plaintiffs repeat and incorporate by reference the allegations of the preceding

paragraphs.

121.     RICO creates a private right of action for "[a]ny person injured in his business or

property by reason of a violation of [18 U.S.C. § 1962]."  18 U.S.C. § 1964(c).  Under

48

18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

122.     The Non-Governmental Defendants, together with the City of Cambridge and Town of Georgetown, for their mutual and individual profit, purportedly agreed and conspired to violate 18 U.S.C. § 1962(c) by forming an association-in-fact enterprise for the purpose of cultivating marijuana at 401 East Main Street, Georgetown, MA and selling it at 98 Winthrop Street, Cambridge, MA and other RMD locations throughout the Commonwealth and beyond.  Defendants knew, or should have known, that this patently unlawful scheme could only be accomplished through a pattern of racketeering activity for maintaining a premises at which marijuana is cultivated and sold, cultivating and selling marijuana, and possessing the goods and materials needed to cultivate and process marijuana are all illegal and crimes under the CSA.  *See, e.g.*, 21 U.S.C. §§ 841(a), 843(a)(6), 856.

123.     Funding, goods, and services procured by said Defendants in furtherance of their association-in-fact enterprise for the purpose of cultivating and selling marijuana have purportedly moved in interstate commerce, and the enterprise sells and advertises marijuana grown at 401 East Main Street, Georgetown, MA in interstate commerce.

124.     The Defendants have engaged in racketeering activity in furtherance of their conspiracy to violate 18 U.S.C. § 1962(c).  All of the Non-Governmental Defendants violated 21 U.S.C. § 846 by agreeing and conspiring to assist in the establishment of the 401 East Main Street, Georgetown, MA marijuana cultivation facilities or in the operations of Healthy Pharms's marijuana business.  And Healthy Pharms, Timbuktu, 3

Brothers, and their agents entered into a real estate agreement to operate a marijuana

cultivation and sale in violation of 21 U.S.C. § 856.

125.    Racketeering activities undertaken in furtherance of the Non-Governmental

Defendants' conspiracy to violate 18 U.S.C. § 1962(c) have damaged the Plaintiffs'

property and otherwise damaged the Plaintiffs.  Specifically, the lease, construction,

and operation of the marijuana facility at 98 Winthrop Street, Cambridge, MA in

violation of 21 U.S.C. § 856 and the drug conspiracy of which those actions are a part

directly and proximately injured the Plaintiffs' property and damaged the Plaintiffs by

causing a substantial diminution in market value and other losses, making it more

difficult to sell or rent, and subjecting it to the scourge of noxious smells that could

travel onto that property, that will interfere with owner and tenant use and enjoyment.


## COUNT III
## Violation of 18 U.S.C. § 1962(c)
## Against Nathaniel Averill and Paul Overgaag

126.    Plaintiffs repeat and incorporate by reference the allegations of the preceding

paragraphs.

127.    RICO creates a private right of action for "[a]ny person injured in his business or

property by reason of a violation of [18 U.S.C. § 1962]."  18 U.S.C. § 1964(c).  Under

18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any

enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity or collection of unlawful debt."

128.    An "enterprise" for purposes of RICO "includes any . . . partnership, corporation,

association, or other legal entity." 18 U.S.C. § 1961(4). Healthy Pharms is a

Massachusetts corporation. Thus, it is a RICO "enterprise."

129.    Upon information and belief, Nathaniel Averill and Paul Overgaag are significant

or principal owners and members of Healthy Pharms and have authority to act on its

behalf. They therefore have roles in directing and managing its affairs.

130.    Nathaniel Averill and Paul Overgaag have each conducted or participated in the

conduct of the affairs of Healthy Pharms through a pattern of racketeering activity.

Together, they oversee the growing, processing, and sale of marijuana at Healthy

Pharms's 401 East Main Street, Georgetown, MA cultivation facility and 98 Winthrop

Street, Cambridge, MA RMD  in violation of 21 U.S.C. § 841(a), 21 U.S.C.

§ 843(a)(6), and 21 U.S.C. § 856. Upon information and belief, they have sought

investors or partners for their business activities. They also entered into a lease under

which marijuana is being or to be cultivated at 401 East Main Street, Georgetown, MA

and is to be sold at 98 Winthrop Street, Cambridge, MA in violation of 21 U.S.C.

§ 856. They purportedly conspired with each other, Timbuktu, 3 Brothers, Red Line,

and Healthy Pharms to violate numerous provisions of the CSA by growing marijuana

and thus violated 21 U.S.C. § 846. They advertise marijuana for sale over the Internet

in violation of 21 U.S.C. § 843(c)(2)(A). On information and belief, they have each

violated 21 U.S.C. § 843(b) by using the telephone, email, or other communication

facilities to take steps in furtherance of the many violations of the CSA that occur at

their cultivation and RMD facilities throughout Massachusetts. Each of those crimes is

racketeering activity under 18 U.S.C. § 1961(1)(D), and together they represent an ongoing pattern that will continue unless this Court intervenes.

131.     Funding, goods, and services procured by Nathaniel Averill and Paul Overgaag for Healthy Pharms's unlawful activities have moved in interstate commerce, and Healthy Pharms sells marijuana—including marijuana grown at the 401 East Main Street, Georgetown, MA cultivation facility—in the interstate market for illegal drugs.

132.     Nathaniel Averill and Paul Overgaag directly and proximately injured or damaged the Plaintiffs' property by causing a significant diminution in its market value, making it more difficult to sell and rent, and created the potential hazard of noxious smells travelling onto Plaintiffs' property.

**COUNT IV**
**Violation of 18 U.S.C. § 1962(d)**
**Against Nathaniel Averill, Paul Overgaag, Century Bank, 4Front, 4Front**
**Holdings, Kris T. Krane, Tomolly, 3 Brothers, Red Line, and John Does 1, 2, 3,**
**and 4**

133.     Plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

134.     RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Nathaniel Averill, Paul Overgaag, 4Front, 4Front Holdings, Kris T. Krane, Tomolly, 3 Brothers, Red Line, John Does 1, 2, 3, and 4, and Century Bank agreed and conspired to violate 18 U.S.C. § 1962(c).

135.    An "enterprise" for purposes of RICO "includes any . . . partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4).  Healthy Pharms is a Massachusetts corporation.  It is a RICO "enterprise."

136.    Funding, goods, and services procured in furtherance of Healthy Pharms's unlawful activities have moved in interstate commerce, and Healthy Pharms sells marijuana—including marijuana cultivated at 401 East Main Street, Georgetown, MA—in the interstate market for illegal drugs.

137.    Upon information and belief, Nathaniel Averill, Paul Overgaag, 4Front, 4Front Holdings, Kris T. Krane, Tomolly, 3 Brothers, Red Line, John Does 1, 2, 3, and 4, and Century Bank, are each associated with Healthy Pharms and agreed to assist Healthy Pharms establish and operate a marijuana cultivation facility at 401 East Main Street, Georgetown, MA and RMDs throughout Massachusetts, including at 98 Winthrop Street, Cambridge, MA.

138.    Nathaniel Averill, Paul Overgaag, 4Front, 4Front Holdings, Kris T. Krane, Tomolly, 3 Brothers, Red Line, John Does 1, 2, 3, and 4, and Century Bank, each understood that their collective efforts to establish and operate the marijuana operations at 98 Winthrop Street, Cambridge, MA and at 401 East Main Street, Georgetown, MA could only be accomplished through a pattern of racketeering activity.  Specifically, all parties understood and/or agreed that Nathaniel Averill and Paul Overgaag would violate the CSA by cultivating marijuana and selling it, 21 U.S.C. § 841(a), possessing the equipment and materials necessary for marijuana cultivation, *id.* § 843(a)(6), and maintaining the premises at 401 East Main Street, Georgetown, MA for cultivating and

selling marijuana at 98 Winthrop Street, Cambridge, MA, *id.* §§ 849, 856. Each of those crimes is racketeering activity, and together they form an ongoing pattern.

139. Racketeering activities undertaken in furtherance of the conspiracy among Nathaniel Averill, Paul Overgaag, 4Front, 4Front Holdings, Kris T. Krane, Tomolly, 3 Brothers, Red Line, John Does 1, 2, 3, and 4, and Century Bank, to violate 18 U.S.C. § 1962(c), have damaged the Plaintiffs' property. Specifically, the construction at 98 Winthrop Street, Cambridge, MA in violation of 21 U.S.C. § 856 and the drug conspiracy of which that construction is a part directly and proximately injured or damaged the Plaintiffs' property by resulting in a substantial diminution of market value, frustrating a redevelopment scheme to bring 57 JFK Street and 16-18 Eliot Street to their highest-and-best-use, making the Plaintiff-owned properties more difficult to sell or rent, as well as the properties of surrounding owners/operators, all to the damage of Plaintiffs' property.

## PREEMPTION COUNTS
## COUNT V
### Federal Preemption of State Marijuana Licensing
### Against State Defendants

140. Plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

141. The Supremacy Clause makes the United States Constitution and constitutionally authorized federal statutes "the supreme law of the land . . . anything in the constitution or laws of any state to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Thus, where federal and state law conflict, state law is preempted and must yield. Federal Courts sitting in equity have the power to set aside actions of state officials that are preempted under the Supremacy Clause.

54

142.    Although the CSA does not occupy the field of marijuana regulation, it states that

state law is preempted where "there is a positive conflict" between the CSA and state

law "so that the two cannot consistently stand together."  21 U.S.C. § 903.

143.    The CSA imposes substantial criminal penalties on those who unlawfully

cultivate and commercially distribute marijuana.  *See id.* § 841(b)(1).  Those penalties

reflect Congress's determination that marijuana should be listed as a Schedule I drug,

because it has a high potential for abuse.  *See id.* § 812(b)(1), (c).  The CSA thus

embodies a strong federal policy that seeks to eliminate the commercial cultivation and

distribution of marijuana through a complete criminal prohibition of those activities.

144.    Despite the federal criminal ban on the commercial cultivation and distribution of

marijuana, DPH  (as well as the City of Cambridge and the Town of Georgetown)

raises revenue for the Commonwealth of Massachusetts (and individual cities and

towns) through a regulatory regime that purports to authorize, regulate, and tax federal

drug crimes involving marijuana. It is impossible to operate a DPH-licensed marijuana

facility without violating federal law.

145.    DPH's licenses also affirmatively assist and promote the commercial cultivation

and distribution of marijuana by functioning as a state endorsement of licensed

businesses and employees.  This endorsement assists potential marijuana investors and

customers by assuring them that licensees have been investigated and approved by the

State.

146.    Thus, DPH's issuance of medical marijuana licenses directly conflicts with the

CSA and poses an obstacle to the achievement of the CSA's purposes.  "[T]here is a

positive conflict" between the CSA and DPH's practice of issuing marijuana licenses

and "the two cannot consistently stand together."  21 U.S.C. § 903.  It follows that

DPH's licensing regime is preempted by federal law and cannot stand.

## COUNT VI
### Federal Preemption of Local Marijuana Licensing
### Against City of Cambridge and Town of Georgetown Defendants

147.     Plaintiffs repeat and incorporate by reference the allegations of the preceding

paragraphs.

148.     The Supremacy Clause makes the United States Constitution and federal statutes

"the supreme law of the land . . . anything in the constitution or laws of any state to the

contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.  Thus, where federal and local

law conflict, local law is preempted and must yield.  Federal Courts sitting in equity

have the power to set aside actions of local governments that are preempted under the

Supremacy Clause.

149.     Although the CSA does not occupy the field of marijuana regulation, it states that

local law is preempted where "there is a positive conflict" between the CSA and local

law "so that the two cannot consistently stand together."  21 U.S.C. § 903.

150.     The CSA imposes substantial criminal penalties on those who unlawfully

cultivate and commercially distribute marijuana.  *See id.* § 841(b)(1).  Those penalties

reflect Congress's determination that marijuana should be listed as a Schedule I drug,

because it has a high potential for abuse.  *See id.* § 812(b)(1), (c).  The CSA thus

embodies a strong federal policy that seeks to reduce the cultivation and distribution of

marijuana through a complete prohibition on those activities.

151.     Despite the federal criminal ban on the commercial cultivation and distribution of

marijuana, the City of Cambridge and Town of Georgetown raise revenue through a

regulatory regime that purports to authorize, regulate, and tax federal drug crimes involving marijuana. It is impossible to operate a Cambridge—or Georgetown-licensed marijuana facility—without violating federal law.

152.    The City of Cambridge and Town of Georgetown Defendants issue licenses/permits that affirmatively assist and promote the cultivation and distribution of marijuana by functioning as an official endorsement of licensed marijuana businesses and employees.  This endorsement assists potential marijuana investors and customers by assuring them that licensees have been investigated and approved by the City of Cambridge and Town of Georgetown.

153.    Thus, the City of Cambridge and Town of Georgetown Defendants' issuance of marijuana licenses directly conflicts with the CSA and poses an obstacle to the achievement of the CSA's purposes.  For this reason, "there is a positive conflict" between the CSA and the City of Cambridge and Town of Georgetown Defendants' practice of issuing marijuana licenses, and "the two cannot consistently stand together." 21 U.S.C. § 903.  The City of Cambridge and Town of Georgetown Defendants' licensing regime is thus preempted by federal law and cannot stand.

## Count IX

### Declaratory Judgment

154.    Plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

155.    28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of the appropriate

pleading, may declare the rights and other legal relations of any interested party seeking
such declaration, whether or not further relief is or could be sought."

156.    Plaintiffs assert RICO, federal preemption, and injunctive relief claims, which are
all incorporated herein by reference, and for which declaratory relief is sought.

157.    As described above, Plaintiffs allege that the City of Cambridge 250 foot
ordinance, both as written and as implemented, is preempted by federal law.

158.    Upon information and belief, the City of Cambridge and its Planning Board have
implemented and will continue to implement the 250 buffer instead of the federal 1000
foot buffer or state suggested 500 foot buffer.

159.    Plaintiffs seek a declaration that the City of Cambridge 250 foot buffer ordinance
and the policy of implementation by the City of Cambridge and its Planning Board is
preempted by federal law.

160.    Plaintiffs seek a declaration of all of the rights, responsibilities, and obligations of
all parties with reference to all of the claims herein.

## PRAYER FOR RELIEF

161.    **WHEREFORE**, Plaintiffs request the following relief:

  a.  Awarding the Plaintiffs damages, including three times the damages to their
  property that was caused by the Non-Governmental Defendants' racketeering
  activities.

  b.  Enjoining and restraining the Non-Governmental Defendants from continuing to
  engage in racketeering activities.

  c.  Declaring that the State Defendants' issuance of a marijuana business and
  occupational licenses to Healthy Pharms is preempted by federal law.

d.   Declaring that the State Defendants' issuance of marijuana business and occupational licenses is preempted by federal law.

e.   Vacating and setting aside the marijuana business and occupational licenses issued by the State Defendants to Healthy Pharms.

f.   Vacating and setting aside the marijuana business and occupational licenses issued by the State Defendants.

g.   Enjoining and restraining the State Defendants from issuing additional marijuana business and occupational licenses to Healthy Pharms, Nathaniel Averill, or Paul Overgaag.

h.   Enjoining and restraining the State Defendants from issuing additional marijuana business and occupational licenses.

i.   Enjoining and restraining Healthy Pharms from operating a website located at www.healthypharms.org, or any subsequently created site, advertising marijuana for sale or describing any marijuana related business activities, including on any Facebook page, Yelp page, or similar website.

j.   Enjoining and restraining 4Front Advisors and 4Front Holdings from operating a website located at http://4frontadvisors.com, or any subsequently created site, describing any marijuana related business activities.

k.   Enjoining and restraining 4Front Advisors and 4Front Holdings from providing any material support to Healthy Pharms.

l.   Declaring that those portions of 105 CMR 725.000, applicable DPH guidance, or other state statutes that purport to authorize or facilitate violations of the federal drug laws are preempted by federal law.

m.  Declaring that the City of Cambridge and Town of Georgetown Defendants' issuance of marijuana business permits/licenses is preempted by federal law.

n.  Enjoining and restraining the City of Cambridge and Town of Georgetown Defendants' from issuing marijuana business permits/licenses.

o.  Declaring that the City of Cambridge special permit grant to Healthy Pharms is preempted by federal law.

p.  Vacating and setting aside the special permit issued by the City of Cambridge for the operation of an RMD at 98 Winthrop Street, Cambridge, MA by Healthy Pharms.

q.  Enjoining and restraining the City of Cambridge and Town of Georgetown from issuing additional marijuana related special permits or licenses.

r.  Enjoining and restraining the City of Cambridge and Town of Georgetown from issuing additional marijuana special permits or licenses to Healthy Pharms, Nathaniel Averill, or Paul Overgaag.

s.  Declaring that those portions of the City of Cambridge Zoning Ordinance or local code that purport to authorize or facilitate violations of the federal drug laws are preempted by federal law.

t.  Awarding Plaintiffs their reasonable costs, including attorneys' fees incurred in bringing this litigation.

u.  A Declaratory Judgment holding that the challenged City of Cambridge zoning ordinance lowering the federal 1000 foot buffer pertaining to drugs near school/colleges, or Massachusetts DPH suggested 500 foot buffer, to a 250 foot buffer zone is preempted by federal law.

v.   A declaration of all of the rights, responsibilities, and obligations of all parties.

w.   A preliminary and permanent injunction prohibiting the City of Cambridge and its

Planning Board from enforcing the challenged ordinance.

x.   Granting such other and further relief as this Honorable Court deems just and

proper and such other declaration of the rights, obligations, and liabilities as may

be necessary and proper

Dated:  September 7, 2017

Respectfully submitted,

s/Alvin S. Nathanson
Alvin S. Nathanson (BBO #367480)
*Counsel of Record*
Jason A. Webber (BBO #667619)
Scott A. Schlager (BBO # 695421)
NATHANSON & GOLDBERG, PC
Two Atlantic Avenue, Fifth Floor
Boston, Massachusetts 02110
Tel.: (617) 210-4800
Fax.: (617) 210-4824
asn@natgolaw.com
jaw@natgolaw.com
sas@natgolaw.com

*Special Litigation Consultants*
David H. Thompson (D.C. Bar ID # 450503)
Peter A. Patterson (D.C. Bar ID# 998668)
Brian W. Barnes (D.C. Bar ID# 1018419)
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel.: (202) 220-9600 | Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
(*pro hac vice*—admission pending)