UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMSON GALERIA LIMITED   *
PARTNERSHIP, et al.,   *
         *
   Plaintiffs,    *
         *
   v.      *    Civil Action No. 17-cv-11696-ADB
         *
HEALTHY PHARMS, INC., et al.,   *
         *
   Defendants.    *
         *

## MEMORANDUM AND ORDER ON MOTIONS TO DISMISS

BURROUGHS, D.J.

    Plaintiffs are property owners in Harvard Square who claim that they have been injured

by the anticipated opening of a licensed marijuana dispensary in their neighborhood. They assert

claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

1962(c) and (d), and seek declaratory and injunctive relief against the dispensary and other

related parties for acting and conspiring to distribute marijuana in violation of the Controlled

Substances Act ("CSA"), 21 U.S.C. §§ 801–904. Plaintiffs also bring claims against state and

local government entities for declaratory and injunctive relief on the grounds that federal law

preempts Massachusetts' regulatory regime implementing the legalization of medical marijuana

dispensaries.[1]

---

[1] The Complaint [ECF No. 1] sets forth the following claims: (1) violation of 18 U.S.C. §
1962(c) against the Healthy Pharms Defendants and Red Line; (2) violation of 18 U.S.C. §
1962(d) against all defendants except the Government Defendants and Town of Georgetown; (3)
violation of 18 U.S.C. § 1962(c) against Mr. Averill and Mr. Overgaag; (4) violation of 18
U.S.C. § 1962(d) against the Healthy Pharms Defendants, Red Line, Tomolly, Century Bank, the
4Front Defendants, and John Does 1-4; (5) federal preemption of state marijuana licensing
against the State Defendants; (6) federal preemption of local marijuana licensing against the City
of Cambridge and Town of Georgetown; and (7) declaratory judgment.

Currently pending before the Court are separate motions to dismiss filed by six groups of defendants: (1) 4Front Advisors, LLC, 4Front Holdings, LLC, and Kristopher Krane (collectively, the "4Front Defendants") [ECF No. 49]; (2) the City of Cambridge [ECF No. 51]; (3) Massachusetts Department of Public Health ("DPH") and Maura T. Healey, in her official capacity as Attorney General of the Commonwealth of Massachusetts (the "Commonwealth") (collectively, the "State Defendants" and with the City of Cambridge, the "Government Defendants") [ECF No. 52]; (4) Century Bank and Trust Company ("Century Bank") [ECF No. 54]; (5) Healthy Pharms, Inc. ("Healthy Pharms"), Timbuktu Real Estate, LLC ("Timbuktu"), Paul Overgaag, Nathaniel Averill, and 3 Brothers Real Estate, LLC ("3 Brothers") (collectively, the "Healthy Pharms Defendants") [ECF No. 57]; and (6) Red Line Management, LLC ("Red Line") and Tomolly, Inc. ("Tomolly") [ECF No. 60].[2]

For the reasons stated herein, the Government Defendants' motions to dismiss [ECF Nos. 51, 52] are <u>GRANTED</u> and the remaining motions to dismiss [ECF Nos. 49, 54, 57, 60] are <u>DENIED</u> with leave to renew. Plaintiffs filed this action before the dispensary at issue had opened for business, basing their case on the idea that the mere public disclosure of a planned dispensary damaged their property interests. Shortly after the pending motions were filed, the dispensary apparently opened its doors to the public. Plaintiffs ask the Court to take judicial notice of this fact or grant leave to amend the complaint. Despite Plaintiffs' failure to establish an adequate foundation for taking judicial notice, or to properly request leave to amend, the Court grants Plaintiffs leave to file an amended complaint within 30 days, given the early stage of the case, the liberal amendment policy of Fed. R. Civ. P. 15, and the potential for this alleged factual development to impact the entirety of the proceedings.

---

[2] The Town of Georgetown answered the Complaint. [ECF No. 34]. The John Doe Defendants are four unidentified insurance companies that allegedly issued insurance policies to Defendants.

# I.     BACKGROUND

In 2012, the Commonwealth of Massachusetts legalized the sale of marijuana for medical use through Registered Marijuana Dispensaries ("RMDs"), and in May 2013, the DPH promulgated regulations that authorized municipalities to regulate the medical use of marijuana. Compl. ¶¶ 32, 46, 47. See Mass. Gen. Laws ch. 94C, §§ 1−9; 105 Mass. Code Regs. 725.000 *et seq*. As of March 2017, nine RMDs were open for retail sales in Massachusetts and an additional 88 were registered and at varying stages of completion. Compl. ¶ 48. In contrast, under federal law, the CSA criminalizes the manufacture, distribution, or possession of marijuana. 21 U.S.C. § 841(a)(1), (b)(1)(A)(vii) and (b)(1)(B)(vii). See also Gonzales v. Raich, 545 U.S. 1, 22 (2005) (holding that the CSA does not violate the Commerce Clause by criminalizing intrastate cultivation and possession of marijuana for medical purposes). The United States Attorney General and Department of Justice have at times exercised discretion in the enforcement of the CSA in response to the legalization of the sale of marijuana in certain states, but criminalization of marijuana under the CSA remains in place.[3] See United States v. Canori, 737 F.3d 181, 185 (2d Cir. 2013) ("The Attorney General's exercise of [such] discretion . . . neither legalizes marijuana nor creates a constitutional crisis."). "The inherent conflict between the [CSA] and [the state's] marijuana regulatory regime lies at the heart of the RICO claims" asserted in this case. Safe Streets Alliance v. Alternative Holistic Healing, LLC, No. 15-cv-00349-REB-MLC,

---

[3] For instance, in August 2013, then-Deputy Attorney General James Cole issued a guidance memorandum ("Cole Memorandum") that, while leaving intact the authority of the Department of Justice to enforce federal law regardless of state law, declared that "enforcement of state law by state and local law enforcement and regulatory bodies should remain the primary means of addressing marijuana-related activity," unless the state's "regulatory structure" and "enforcement efforts" are not "sufficiently robust." See West v. Lynch, 845 F.3d 1228, 1232 (D.C. Cir. 2017). The Cole Memorandum was rescinded as of January 4, 2018. See Office of Att'y Gen., Memorandum for All United States Attorneys (Jan. 4, 2018), https://www.justice.gov/opa/ press-release/file/1022196/download.

2016 WL 11384332, at *18−19 (D. Colo. Feb. 8, 2016), aff'd in part, rev'd in part, Safe Streets

All. v. Hickenlooper, 859 F.3d 865 (10th Cir. 2017).

Defendant Healthy Pharms operates a marijuana cultivation facility at 401 East Main

Street, Georgetown, Massachusetts, pursuant to permits from Defendant Town of Georgetown

and a license from Defendant DPH. Compl. ¶¶ 34, 64, 72, 80. Defendant 3 Brothers owns the

property in Georgetown where Healthy Pharms operates its facility. Id. ¶ 69. The Georgetown

facility can hold "as many as several hundred marijuana plants." Id.

On April 26, 2017, Defendant City of Cambridge issued Healthy Pharms a special permit

to operate an RMD at 98 Winthrop Street in Harvard Square. Compl. ¶¶ 33, 58−59, 73.

Defendant Timbuktu owns the building at 98 Winthrop Street and leases the property to Healthy

Pharms. Compl. ¶¶ 65−66. The individual defendants, Mr. Overgaag and Mr. Averill, are

officers or principals of several of the defendant entities. Mr. Averill is the President of Healthy

Pharms. Id. ¶¶ 6, 9. Mr. Overgaag is an officer, manager, and/or resident agent of Healthy

Pharms, Timbuktu, and 3 Brothers. Id. ¶¶ 6−8, 37. He is also the president of Defendant

Tomolly, the tenant at 98 Winthrop Street before Healthy Pharms. Id. ¶¶ 37, 65. Mr. Overgaag

and Mr. Averill also have authority to sign documents on behalf of Defendant Red Line, which is

involved in the management of the property at 98 Winthrop Street. Id. ¶¶ 9, 37.

As part of an alleged enterprise to cultivate and sell marijuana, the Healthy Pharms

Defendants have "taken active steps to prepare 98 Winthrop Street for use as a marijuana

[dispensary], including seeking to engage a contractor to make alterations to the property,"

possessing equipment for the marijuana cultivation at the Georgetown facility, communicating

by telephone and email to lease the Georgetown and Cambridge properties, and maintaining a

website that advertises the pricing, quality, and sale of marijuana. Id. ¶¶ 69, 71, 81, 138. The

4Front Defendants engaged in "consulting activities" for Healthy Pharms and operate a website that provides support to marijuana companies. Id. ¶ 36. Defendant Century Bank provides banking services to Healthy Pharms knowing that it intends to operate a marijuana business. Id. ¶ 83.

Plaintiffs are entities that own properties that abut 98 Winthrop Street or are located within 200 feet of it. Compl. ¶¶ 1−5, 90−93. They rent these properties to retail and residential tenants. [ECF Nos. 1-15, 1-16, 1-18, & 1-20]. The prospect of an RMD opening at 98 Winthrop Street has allegedly diminished the market value of neighboring properties, because the odor of marijuana "will purportedly disrupt commercial tenants and interfere[] with the neighboring owners' use and enjoyment of their property," and there is "stigma" associated with the sale of marijuana. Compl. ¶¶ 95, 97, 102. According to Plaintiffs, the planned opening of the RMD makes Harvard Square a less desirable location for businesses that wish to operate in a "pleasant and historic area," as prospective buyers or renters "reasonably worry" about "increase[d] crime" and "pungent odors." Id. ¶ 97. Moreover, Plaintiffs assert that the proposed RMD has made their properties "more difficult to sell or rent," and "has prevented realization of a development scheme that would bring Plaintiffs' properties to their highest-and-best use." Id. Plaintiffs planned to build three-story additions to certain of their properties, but investors will not finance Plaintiffs' construction projects in light of the proposed RMD. Compl. ¶ 101.

In support of their allegations of injury, Plaintiffs engaged a licensed real estate appraiser, Webster A. Collins, to provide a "determination of damages and lost profits attributable to the stigma of a proposed marijuana dispensary at 98 Winthrop Street." Compl. ¶ 99; [ECF No. 1-10 at 1]. Mr. Collins inspected Plaintiffs' properties and interviewed brokers and leasing agents who opined that the prospect of a marijuana dispensary makes tenants uncomfortable and lowers the

market rent and quality of interested tenants. Compl. ¶ 100. In determining that the stigma

associated with an RMD is comparable to the stigma of a drug and alcohol treatment center or

groundwater-contaminated property that endangers human health, Mr. Collins concluded that the

proposed RMD has caused a loss of $18,785,000 in value and $8,290,000 in lost profits to

Plaintiffs' properties. Compl. ¶¶ 99, 105; [ECF Nos. 1-4 at 1; 1-43 at 1].

Although the Complaint describes 98 Winthrop Street as a "planned" facility, because it

had not opened at the time of the filing of the Complaint, Plaintiffs report in their opposition that

the RMD opened for business on December 30, 2017. See Compl. ¶ 80; [ECF No. 65 at 10].

## II.     STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court

must accept as true all well-pleaded facts, analyze those facts in the light most hospitable to the

Plaintiffs' theory, and draw all reasonable inferences from those facts in favor of the Plaintiffs.

United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). The

facts alleged must be sufficient to "state a claim to relief that is plausible on its face." A.G. ex

rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard invites a two-step analysis. Id.

"At the first step, the court 'must separate the complaint's factual allegations (which must be

accepted as true) from its conclusory legal allegations (which need not be credited).'" Id.

(quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). "At the second step,

the court must determine whether the remaining factual content allows a reasonable inference

that the defendant is liable for the misconduct alleged." Id. (internal quotations and citation

omitted). "[T]he combined allegations, taken as true, must state a plausible, not a merely

conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "'is subject to the same standard of review' as a motion to dismiss under Rule 12(b)(6)." Breda v. McDonald, 153 F. Supp. 3d 496, 499 (D. Mass. 2015) (citing Castino v. Town of Great Barrington, No. 13-cv-30057-KPN, 2013 WL 6383020, at *1 (D. Mass. Dec. 4, 2013)). Courts may, however, consider evidence outside the pleadings in determining jurisdiction. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002), as corrected (May 8, 2002).

### III.    JUDICIAL NOTICE

When Plaintiffs filed the Complaint on September 7, 2017, the RMD at 98 Winthrop Street had not begun operating. Compl. ¶ 69. Defendants filed their motions to dismiss on December 15, 2017, arguing in part that because the RMD had not opened and might never open, Plaintiffs lacked standing under Article III of the United States Constitution, had failed to plead a pattern of racketeering activity, and could not demonstrate an injury that was proximately caused by the alleged RICO violations. [ECF Nos. 49−61]. Two weeks later, the RMD apparently opened and, according to Plaintiffs, is "now selling marijuana from that location." [ECF No. 65 at 12]. Plaintiffs refer to and rely upon this alleged factual development throughout their opposition. See, e.g., id. at 10−12, 15−16, 23, 36, 49. They ask that the Court take judicial notice of this fact, or alternatively, allow them to amend the Complaint. [ECF No. 65 at 12 n.1].

"Under Fed. R. Evid. 201(b), a judge may take notice of an adjudicative fact only if it is 'not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" Sarvis v. Polyvore, Inc., No. 12-

cv-12233-LTS, 2015 WL 5934759, at *4 (D. Mass. Aug. 24, 2015), <u>report and recommendation</u>

<u>adopted</u>, 2015 WL 6182226 (D. Mass. Sept. 14, 2015) (quoting <u>Lussier v. Runyon</u>, 50 F.3d

1103, 1113 (1st Cir. 1995)). Plaintiffs offer no support for finding that this allegation is

"generally known within the territorial jurisdiction of the trial court." <u>Id.</u> They instead provide

(1) an undated printout of the homepage of Healthy Pharms' website announcing that Healthy

Pharms is "[now open] in historical Harvard Square in Cambridge, MA as of Saturday,

December 30th 2017" and (2) an undated printout of a Boston Globe newsletter titled "This

Week in Weed" which reads, "We hear Healthy Pharms will finally open its medical marijuana

dispensary in Harvard Square around noon Saturday." [ECF Nos. 65-1 at 2, 65-2 at 5].

First, neither source indicates that Healthy Pharms has completed sales of marijuana at its

Cambridge location as Plaintiffs assert in their opposition. The newsletter does not report that

Healthy Pharms opened but that it "will" open on a future date. [ECF No. 65-2 at 5]. Moreover,

Plaintiffs do not merely request judicial notice of the website's existence or the newsletter's

publication, but also that the Court "take notice of the truth of the matters asserted"

therein. <u>Greenspan v. Ramdom House, Inc.</u>, No. 12-1594, 2012 WL 5188792, at *1 (1st Cir. Oct.

16, 2012) (denying motion requesting that court take judicial notice of truth of matter asserted in

newspaper article); <u>Cofield v. Ala. Pub. Serv. Comm'n</u>, 936 F.2d 512, 517 (11th Cir. 1991)

("That a statement of fact appears in a daily newspaper does not of itself establish that the stated

fact is capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned." (internal quotation marks omitted)). Plaintiffs essentially relegate

their entire argument to a footnote that contains no legal basis for concluding that their new

allegations are properly noticeable from the sources provided. Accordingly, the request for

judicial notice is denied.

## IV. REQUEST FOR LEAVE TO AMEND

Plaintiffs contend that the Complaint is adequately pled as is but nonetheless ask for leave to amend if the request for judicial notice is denied. [ECF No. 65 at 12 n.1]. Even if it were appropriate under the circumstances, taking judicial notice of the mere opening of the RMD— without additional allegations regarding the conduct occurring at the RMD or the resulting injuries—would not sufficiently account for this material development in a way that would allow the case to proceed in a practical or logical manner. Plaintiffs would be relying on the predicate acts and damages occurring at the RMD now that it is open, but proceeding with a Complaint that is solely based on allegations that it might open. Rather than seeking leave to amend, contingent on the merits of their request for judicial notice, Plaintiffs should have filed an amended or supplemental pleading when the RMD opened, which would have saved time and resources and provided the Court with a more complete and accurate set of allegations to assess the plausibility of the claims. See Fed. R. Civ. P. 15(a) & (d). In Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 61 (1st Cir. 2018), the First Circuit affirmed this Court's denial of leave to amend, even assuming that the proposed amended complaint was not futile, where plaintiffs "waited for the [c]ourt's ruling on the [m]otion to [d]ismiss" for three months after discovering new information. As the First Circuit has repeatedly stated, "Plaintiffs may not, having the needed information, deliberately wait in the wings" to see if the Complaint will survive the motion to dismiss. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 57 (1st Cir. 2008).

Although the Court does not countenance Plaintiffs' "wait and see approach," Kader, 887 F.3d at 61, or the consequent delay in fully addressing the issues presented, Fed. R. Civ. P. 15(a)(2) provides that the Court should "freely give leave [to amend] when justice so requires." "[Rule 15] reflects a liberal amendment policy," and "the district court enjoys significant latitude

in deciding whether to grant leave to amend." Advest, 512 F.3d at 55 (citation omitted). A court may deny leave to amend for reasons including "undue delay, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962). A request to amend a complaint "requires the court to examine the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations." Palmer v. Champion Mortg., 465 F.3d 24, 30–31 (1st Cir. 2006).

For the reasons stated herein, although leave to amend cannot cure the threshold deficiencies in the claims against the Government Defendants, the Court cannot determine at this stage that an amendment would be futile with regard to the non-government Defendants. Plaintiffs are therefore granted 30 days to file an amended complaint consistent with this order. To further explain why the Court cannot determine that an amendment would be futile at this time, and to provide the parties with additional guidance should the Plaintiffs choose to file an amended complaint, the Court addresses the issues raised in the non-government Defendants' motions to dismiss. See Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) ("In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion."); see also Pruell v. Caritas Christi, 678 F.3d 10, 15 (1st Cir. 2012) (helpful on remand for court "to indicate to plaintiffs what deficiencies remain" and what court expects to be improved in amended complaint).

## V.    GOVERNMENT DEFENDANTS' MOTIONS TO DISMISS

Plaintiffs' claims against the Government Defendants (Counts V, VI, and IX) assert that Massachusetts' state and local regulation of RMDs conflicts with the CSA and is therefore preempted by federal law. Plaintiffs also argue that the Court has the equitable power to enjoin

the Government Defendants from enforcing regulations that conflict with the CSA, even if neither the Supremacy Clause nor the CSA provide a private right of action.

The Tenth Circuit appears to be the only federal Court of Appeals to address a civil RICO action brought by neighboring property owners against a licensed marijuana cultivation facility and related governmental entities. See Safe Streets Alliance v. Hickenlooper, 859 F.3d 865 (10th Cir. 2017). Safe Streets Alliance arose out of the legalization of recreational marijuana in Colorado by constitutional amendment. 589 F.3d at 876. The owners of property adjacent to a functioning marijuana cultivation facility brought civil RICO claims alleging that the public disclosure and completed construction of the facility interfered with the use and enjoyment of their property and diminished its market value. Id. at 879. The plaintiffs also asserted causes of action in equity against the state and county, claiming that the CSA preempted Colorado's constitutional amendment. Id. at 876−77, 891−92.

Like the plaintiffs in that case, Plaintiffs here do not contend that the preemption provision or any other section of the CSA "vests private citizens with any relevant substantive rights." Id. at 894. Rather, Plaintiffs "are simply invoking [the Article III court's] equitable authority to enjoin actions by state officers that are preempted by the CSA and thus violate the Supremacy Clause." Id. (internal quotation marks omitted). As in Safe Streets Alliance, however, Plaintiffs in this case do not "purport to identify any substantive rights . . . that serve as the foundation for their alleged causes of action in equity for sweeping injunctive relief."[4] Id. The Tenth Circuit sufficiently addressed this same argument as follows:

---

[4] Courts have also consistently held that the CSA does not confer a private right of action. See, e.g., Quillinan v. Ainsworth, No. 17-cv-00077-KAW, 2018 WL 2151936, at *6 (N.D. Cal. May 10, 2018) ("[T]he [CSA] does not permit a civil action to be brought by a private-citizen plaintiff to enforce compliance."); Durr v. Strickland, 602 F.3d 788, 789 (6th Cir. 2010). Similarly, the Supreme Court recently affirmed that there is no private right of action to enforce the Supremacy Clause. See Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378, 1383 (2015) ("It is

[T]he Supreme Court has explained that "to invoke the" Article III courts' equitable powers, a plaintiff asserting a cause of action to enforce a federal statute must have "a federal right that [he or she] possesses against" the defendant. Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 260 (2011). "Such litigation *cannot occur* unless the" plaintiff "has been *given* a *federal right of*" his or her "*own* to vindicate . . . under the . . . statute at issue" in the case. Id. at 261 n.8 (emphasis added). Therefore, unless a private plaintiff has been given a federal right of her or his own to vindicate *in the CSA*, the plaintiff cannot maintain a cause of action—in law or in equity—against any defendant for violating the CSA. Id.

Safe Streets Alliance, 859 F.3d at 902. The court further explained that "to determine whether a private plaintiff may enforce the CSA, [the court] must first determine whether that plaintiff has substantive rights in the CSA that he or she is seeking to vindicate . . . . Only if the CSA includes such rights will [the court] have any call to determine what causes of action are available to enforce those rights, and for what remedies." Id. at 903. The Plaintiffs in this case, like the Safe Street Alliance plaintiffs, "were . . . required to plausibly allege that they are vindicating a federal substantive right to be able to maintain a cause of action in equity." Here, Plaintiffs did not assert such a right and therefore have not stated a viable cause of action against the Government Defendants. Id. at 903−04.

Presumably aware of this, Plaintiffs rely on Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378 (2015) and the interpretation thereof in the Safe Street Alliance concurring opinion, to argue that the absence of a substantive right does not foreclose the availability of equitable relief. Even if Plaintiffs were correct, applying the analysis articulated by the Armstrong court actually demonstrates that equitable relief is unavailable under the CSA. As an initial matter, the Armstrong court reiterated that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and that "[c]ourts in equity can no more disregard statutory and constitutional requirements and

_____

equally apparent that the Supremacy Clause is not the 'source of any federal rights,' . . . and certainly does not create a cause of action." (citation omitted)).

provisions than can courts of law." Armstrong, 135 S. Ct. at 1385 (citation omitted). The

Armstrong court then identified statutory language that can signal Congress's "intent to

foreclose" equitable relief under a particular statute. Id. First, the statute at issue (here, the CSA)

may demonstrate intent to preclude private enforcement through the "express provision of one

method of enforcing a substantive rule," which "suggests that Congress intended to preclude

others." Id. Second, the "judicially unadministrable nature" of a statute, and Congress's explicit

delegation of sole enforcement of a statute's "judgment-laden standard" to an agency, shows that

Congress "wanted to make the agency remedy that it provided exclusive." Id. (citation omitted).

Here, the CSA provisions that criminalize the possession and distribution of marijuana,

see, e.g., 21 U.S.C. §§ 841, 843, 848, 854, 856, "may be enforced criminally, civilly, or

administratively," but the authority to enforce these provisions rests only with the United States

Attorney General and the Department of Justice. Safe Streets Alliance v. Alternative Holistic

Healing, LLC, No. 15-cv-00349-REB-CBS, 2016 WL 223815, at *4 (D. Colo. Jan. 19, 2016),

aff'd sub nom., Safe Streets Alliance, 859 F.3d 865; see Schneller ex rel. Schneller v. Crozer

Chester Med. Ctr., 387 F. App'x 289, 293 (3d Cir. 2010) (CSA is "enforceable only by the

Attorney General and, by delegation, the Department of Justice"); Ringo v. Lombardi, No. 09-

cv-4095-C-NKL, 2010 WL 3310240, at *3 (W.D. Mo. Aug. 19, 2010) ("Congress provided

specific means of remedying CSA violations via the Attorney General. There is no indication

that anything outside the statute would expand that remedy to encompass a private right of

action.").

As to the second Armstrong factor, the district court in Safe Street Alliance appropriately

described the CSA as follows:

> The recognition of [the Attorney General's] sweeping prosecutorial discretion
> addresses directly the second factor identified in Armstrong as suggesting an intent

> to foreclose equitable relief: the "judicially unadministrable nature" of the CSA. <u>Armstrong</u>, 135 S. Ct. at 1385. There certainly can be no more "judgment-laden standard" than that which confers almost complete discretion on the Attorney General to determine whether to assert the supremacy of federal law to challenge arguably conflicting state marijuana laws. <u>See</u> <u>id.</u>

<u>Safe Streets Alliance</u>, 2016 WL 223815, at *5. In reference to the Cole Memorandum, the district court explained that allowing private litigants to interfere with the Department of Justice's discretionary decision to allow states to develop their own regulatory schemes regarding medical marijuana "would create precisely the type of 'risk of inconsistent interpretations and misincentives' which strongly counsel against recognizing an implicit right to a judicially created equitable remedy." <u>Id.</u> (quoting <u>Armstrong</u>, 135 S. Ct. at 1385). Although the Department of Justice has since rescinded the Cole Memorandum, the discretion to enact, repeal, and enforce such policies nonetheless continues to rest with the government and not private litigants. In sum, even if the absence of substantive rights under the CSA alone did not foreclose Plaintiffs' claims for equitable relief against the Government Defendants, the text of the CSA and the analysis under <u>Armstrong</u> demonstrate that Plaintiffs cannot invoke the Court's equitable power through this lawsuit. <u>See</u> <u>Safe Streets Alliance</u>, 895 F.3d at 904−05 (holding that "[n]o modern authority supports [the plaintiffs'] hypothesis" that Article III courts provide "free-floating injunctive relief"). Accordingly, the claims against the Government Defendants are dismissed.[5]

---

[5] The Court does not reach the merits of the claims against the Government Defendants but notes the outcome of cases challenging the regulation of marijuana dispensaries on preemption grounds in other jurisdictions. <u>See</u> <u>White Mountain Health Ctr., Inc. v. Maricopa Cnty.</u>, 386 P.3d 416, 419 (Ariz. Ct. App. 2016) ("The CSA does not preempt the [Arizona Medical Marijuana Act] to the extent [it] requires the [county] to pass reasonable zoning regulations for [dispensaries] and process papers concerning zoning compliance or requires the State to issue documents to allow [dispensaries] to operate."); <u>Joe Hemp's First Hemp Bank v. City of Oakland</u>, No. 15-cv-05053 WHA, 2016 WL 375082, at *3 (N.D. Cal. Feb. 1, 2016) (finding that CSA did not preempt the City of Oakland's marijuana dispensary permitting scheme); <u>see also</u> <u>Ter Beek v. City of Wyoming</u>, 846 N.W.2d 531, 534 (Mich. 2014) (CSA does not preempt

## VI. NON-GOVERNMENT DEFENDANTS' MOTIONS TO DISMISS

### A. Article III Standing and Ripeness

The non-government Defendants assert that Plaintiffs lack standing and that their claims are unripe under Article III of the United States Constitution, because the Complaint is premised on the hypothetical opening of an RMD. "Much as standing doctrine seeks to keep federal courts out of disputes involving conjectural or hypothetical injuries, the Supreme Court has reinforced that ripeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). Given that Fed. R. Civ. P. 15(d) allows for the supplemental pleading of "newly arising facts necessary to demonstrate standing," even if Plaintiffs lacked standing at the time of filing of the Complaint, Plaintiffs may amend the complaint to demonstrate that the case has become ripe upon the opening of the RMD. United States ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 5 (1st Cir. 2015). Defendants do not appear to press their Article III objections following the alleged opening of the RMD; lack of standing or ripeness at this time therefore does not establish the futility of an amended pleading.

### B. Abstention

Century Bank suggests that the Court should stay this case pursuant to the Burford or Colorado River abstention doctrines in light of an earlier-filed and currently pending appeal of the City of Cambridge's decision to grant Healthy Pharms a special permit to operate the RMD. See Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc., No. 1781-cv-01356 (Mass. Super. Ct.

---

Michigan Medical Marihuana Act that immunizes registered qualifying patients from penalty for specified medical marijuana use).

May 4, 2017). "[F]ederal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" Chico Serv. Station, Inc. v. Sol P.R. Ltd., 633 F.3d 20, 29 (1st Cir. 2011) (quoting Ankenbrandt v. Richards, 504 U.S. 689, 705 (1992)). The Supreme Court, however, "has carved out a discrete set of 'exceptional circumstances' in which the exercise of jurisdiction may be declined. As a general proposition, these 'exceptional circumstances' lie 'where denying a federal forum would clearly serve an important countervailing interest,' such as 'regard for federal-state relations' or 'wise judicial administration.'" Id. (quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)). The appropriate circumstances for abstention are "rare," as "abstention must always be 'the exception, not the rule.'" Id. (quoting Fragoso v. Lopez, 991 F.2d 878, 882 (1st Cir. 1993)).

Century Bank raises Burford abstention based on the potential impact of this case on the medical marijuana regulatory regime in Massachusetts. Where timely and adequate state-court review is available, "the Burford abstention doctrine states that federal courts: 'must decline to interfere with proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import . . .; or (2) where the exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 523–24 (1st Cir. 2009) (citation omitted). "Burford abstention is concerned with avoiding the 'awkward circumstance of turning the federal court into a forum that will effectively decide a host of detailed state regulatory matters.'" Id. at 524 (citation omitted).

Here, after dismissal of the claims against the Government Defendants, what remains in the case are RICO counts against private defendants that do not directly challenge any state law

or require this Court to review an order of a state or local government body. See id. at 525 ("[B]ecause the district court was not called upon to decide any issues of Puerto Rico insurance law, it cannot be said that the exercise of federal review in this case would be 'disruptive of state efforts to establish a coherent policy' under its regulatory scheme."); Fragoso, 991 F.2d at 883 ("Burford abstention is implicated when the federal courts are asked to interfere with state processes by reviewing the proceedings or orders of state administrative agencies."). The resolution of the RICO claims may indirectly impact state and local regulation, but these claims are predicated on violations of the CSA and do not require this Court to specifically decide issues of state or local law. A civil RICO action may also be the subject of a stay under Burford, see DeMauro v. DeMauro, 115 F.3d 94, 98 (1st Cir. 1997), but the benefit or need for one here has not been established. While Century Bank argues that "[r]egulating medical marijuana through RICO decisions in the District Courts would trample the political branches' compromises on these difficult public policy questions," a temporary stay will only serve to delay, and not to prevent, the alleged impact on state public policy issues. Therefore, Burford abstention is unwarranted.

Century Bank's application of Colorado River abstention is also premised on the pending permit appeal in state court, as that action involves some of the same issues raised in this case. Colorado River abstention "is to be approached with the most caution" of all abstention doctrines. Jimenez v. Rodriguez–Pagan, 597 F.3d 18, 27 (1st Cir. 2010). It allows federal courts in limited instances to stay or dismiss proceedings that overlap with concurrent litigation in state court, although the presence of parallel litigation in state court alone does not warrant abstention. Id. at 21, 27. To determine whether there are exceptional circumstances to justify abstention, the Court considers a non-exhaustive list of factors:

> (1) whether either court has assumed jurisdiction over a *res*; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 71–72 (1st Cir. 2005). Here, certain factors are neutral: the federal and Massachusetts forums are equally convenient (second factor); the federal lawsuit is not vexatious or contrived (seventh factor); and removal jurisdiction is not implicated (eighth factor). Although the state-court action concerns the permit issued to Healthy Pharms (first factor) and was filed before this case (fourth factor), the state-court action is limited to an appeal of a city planning board's permitting decision and does not appear to be an adequate means of adjudicating the RICO claims that are predicated on alleged violations of federal law (sixth factor). Further, the need to avoid piecemeal litigation (third factor) should weigh in favor of dismissal "only if there is some 'exceptional basis' for dismissing one action in favor of the other." KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 11 (1st Cir. 2003) (citation omitted). "[D]ismissal is not warranted simply because related issues otherwise would be decided by different courts, or even because two courts otherwise would be deciding the same issues." Id. at 10 (citation omitted). Further, considering that the preemption-based claims against the Government Defendants are dismissed, there is minimal overlap between this case and the state-court action. Because the relevant factors weigh against abstention, the case will not be stayed.

## C.     RICO Claims

RICO "is a statute that Congress enacted as a tool in the federal government's 'war against organized crime,' to help combat 'enduring criminal conduct.'" Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 527 (1st Cir. 2015) (quoting United States v. Turkette, 452 U.S. 576,

587 (1981) and <u>Libertad v. Welch</u>, 53 F.3d 428, 445 (1st Cir. 1995)). "In addition to allowing the criminal prosecution of RICO violators, <u>see</u> 18 U.S.C. § 1962, the statute's reach also provides a generous private right of action—successful plaintiffs are entitled to triple damages if they can prove they were 'injured in [their] business or property by reason of a violation of section 1962.'" <u>Id.</u> (quoting 18 U.S.C. § 1964(c)). To plead a violation of section 1962(c), Plaintiffs must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985). "Section 1962(d) also prohibits any person from conspiring to violate § 1962(c)." <u>United States v. Ramírez-Rivera</u>, 800 F.3d 1, 18 (1st Cir. 2015). Because RICO's private right of action is available to persons who have been injured "by reason of" a substantive RICO violation, a plaintiff may sue "only if the alleged RICO violation was the proximate cause of the plaintiff's injury." <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 453 (2006) (citing <u>Holmes v. Secs. Investor Prot. Corp.</u>, 503 U.S. 258, 268 (1992)).

Here, Plaintiffs bring four RICO counts against the non-government Defendants. Count I (§ 1962(c)), which names the Healthy Pharms Defendants and Red Line, is premised on an enterprise encompassing the non-government Defendants, the Town of Georgetown, and the City of Cambridge. Count II (§ 1962(d)) arises out of the same alleged enterprise and is brought against all of the non-government Defendants. Only Mr. Averill and Mr. Overgaag, as the owners of Healthy Pharms (the alleged enterprise), are named in Count III (§ 1962(c)). Count IV (§ 1962(d)) covers all the remaining Defendants except Healthy Pharms (the alleged enterprise).[6]

---

[6] At this stage, the Healthy Pharms Defendants do not challenge the assertions that the non-government Defendants, the City of Cambridge, and the Town of Georgetown form a plausible enterprise in support of Counts I and II, or that Healthy Pharms constitutes a plausible enterprise under Counts III and IV.

1.      The Healthy Pharms Defendants

The Healthy Pharms Defendants primarily move to dismiss all of the RICO counts on the grounds that Plaintiffs have not suffered an injury that was proximately caused by the alleged predicate acts.[7] To plausibly state an injury, "a RICO damages claim may not be based on mere speculation." Circiello v. Alfano, 612 F. Supp. 2d 111, 114 (D. Mass. 2009). "[A] cause of action does not accrue under RICO until the amount of damages becomes clear and definite." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994). Although Plaintiffs do not need to "cite statistics, appraisals, attempts to sell, or other 'concrete evidence' to 'quantify' their [injury]" at this stage, Safe Streets Alliance, 859 F.3d at 888, the injury pled must be a "concrete financial loss and not mere injury to a valuable intangible property interest." Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000); In re Celexa & Lexapro Mktg. & Sales Practices Litig., No. 14-cv-13848-NMG, 2015 WL 3751422, at *6 (D. Mass. June 15, 2015) (same).

The claimed injuries include (1) that the proposed RMD might emit odors of marijuana that will interfere with use and enjoyment of Plaintiffs' properties; (2) that banks and investors will not finance certain planned projects due to the anticipated RMD; and (3) that the stigma associated with marijuana and the fear of increased crime have already diminished the market value of Plaintiffs' properties. Compl. ¶¶ 95, 97, 101, 102. Although the Complaint ostensibly asserts a ripe injury based on the appraisal, Plaintiffs do not dispute that their damages theory

---

[7] The Healthy Pharms Defendants also argue that Plaintiffs allege only one predicate act—the cultivation and possession of marijuana with the intent to distribute it at the Georgetown facility—and therefore have not pled a pattern of racketeering activity. A "pattern" of racketeering activity requires, among other things, at least two racketeering acts. In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 34 (1st Cir. 2013) (citing 18 U.S.C. § 1961(5)). Regardless of the sufficiency of the allegations as currently pled, an amended complaint will likely describe sales of marijuana occurring at the 98 Winthrop Street RMD to bolster the predicate acts alleged. Therefore, leave to amend is not futile with regard to pleading a pattern of racketeering activity.

relies on the public disclosure of the future possibility of an RMD. They cite no analogous cases in support of their theory other than <u>Safe Streets Alliance</u>, 859 F.3d at 879, where the marijuana facility at issue was in actual operation. The arguably hypothetical or speculative nature of Plaintiffs' injuries, however, may have materially changed since the opening of the RMD. Accordingly, leave to amend is not deemed futile based on the types of injuries alleged.[8]

Assuming that Plaintiffs sufficiently plead an injury, it must be proximately caused by the alleged RICO violations. The Supreme Court in <u>Holmes</u> set forth the standard for RICO proximate causation. <u>In re Neurontin</u>, 712 F.3d at 34. Rather than "announce a black-letter rule that will dictate the result in every case," the RICO proximate cause inquiry focuses on a "directness concern" and "three functional factors." <u>Id.</u> at 35−36 (citing <u>Holmes</u>, 503 U.S. at 271–74). Directness means there must be "some direct relation between the injury asserted and the injurious conduct alleged," such that the link between the conduct and the harm suffered is not "too remote." <u>Id.</u> at 35 (quoting <u>Holmes</u>, 503 U.S. at 268, 271).

The first functional factor considers proof of damages, to the extent that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." <u>Id.</u> at 36 (quoting

---

[8] The Healthy Pharms Defendants also argue that because RICO adopts common law principles for evaluating a cognizable injury to business or property, Plaintiffs cannot plausibly plead an injury arising out of the proposed RMD because it will operate pursuant to a special permit and, under Massachusetts law, "acts which might otherwise be nuisances may be legalized by statute, license or permit." <u>Marshall v. Holbrook</u>, 177 N.E. 504, 506 (Mass. 1931); <u>see Hub Theaters, Inc. v. Mass. Port Auth.</u>, 346 N.E.2d 371, 373 (Mass. 1976). The Healthy Pharms Defendants, however, have not shown that the unavailability of a cause of action to recover for certain nuisances addresses the pertinent question of whether, under state law, "a particular interest is 'property' within the meaning of § 1964(c)." <u>Magnum v. Archdiocese of Phila.</u>, 253 F. App'x 224, 228 (3d Cir. 2007). It is also conceivable that, even if <u>Hollbrook</u> and <u>Hub Theaters</u> are applicable, the dispensary may be subject to a nuisance claim because it caused such a significant disturbance that the decision to grant a special permit was "unwholesome and unreasonable." <u>Hub Theatres, Inc.</u>, 346 N.E.2d at 373. The non-government Defendants may renew this argument on a later motion.

Holmes, 503 U.S. at 269). As to the second functional factor, the Holmes court noted its concern about the "administrability and the avoidance of multiple recoveries," because "[r]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts." Id. (quoting Holmes, 503 U.S. at 269). The third functional factor focuses on "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case." Id. "[T]he need to grapple with these problems [of indirectness] [may be] simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." Holmes, 503 U.S. at 269–70.

Here, the directness concern and the first functional factor appear to favor the Defendants. Defendants did not target or direct the sale of marijuana to harm Plaintiffs as nearby property owners and real estate market participants. The cause of the alleged harm is a set of circumstances (people in Cambridge losing interest in renting or purchasing properties at the market rate in Harvard Square) that is at least somewhat removed from the asserted misconduct (selling marijuana in the neighborhood). See also Hemi Group, LLC v. City of New York, 559 U.S. 1, 9 (2010) (plurality opinion) (no proximate cause where conduct directly responsible for the city's harm was the online cigarette customers' failure to pay their taxes, but the conduct constituting the alleged RICO violation was defendant's failure to file online customer information with the State). As the Healthy Pharms Defendants argue, the independent choice of third parties not to rent or buy Plaintiffs' properties and other housing market forces might break the causal chain. See, e.g., Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 933 (3d Cir. 1999) ("[I]f the [union health and welfare funds] are allowed to

sue, the court would need to determine the extent to which their increased costs for smoking-related illnesses resulted from the tobacco companies' conspiracy to suppress health and safety information, as opposed to smokers' other health problems, smokers' independent (*i.e.*, separate from the fraud and conspiracy) decisions to smoke, smokers' ignoring of health and safety warnings, etc."); <u>see also</u> <u>First Nationwide Bank</u>, 27 F.3d at 772 ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.").

The second and third functional factors, however, seem to weigh toward finding proximate causation. The Healthy Pharms Defendants assert that Plaintiffs cannot establish a direct causal link because they are not the "primary and intended victim[s]" of the RICO violations, but the Healthy Pharms Defendants have identified no other "more immediate victim . . . better situated to sue.'" <u>In re Neurontin Mktg.</u>, 712 F.3d at 37 (quoting <u>Bridge v. Phx. Bond & Indem. Co.</u>, 553 U.S. 639, 658 (2008)). Unlike in <u>Bridge</u> or <u>In re Neurontin</u>, this case does not involve a "scheme to defraud" such that the primary or intended victim is more readily identifiable. <u>Id.</u> at 37. Defendants have not demonstrated that the proximate cause inquiry, which the Supreme Court explained does not rigidly apply black-letter rules, hinges on showing that Plaintiffs are the "primary and intended victim[s]" if the RICO violations do not sound in fraud or unfair competition, or involve injury to a party that is plainly derivative of the injury to another. <u>See</u> <u>id.</u> Although there might not be a civil RICO plaintiff for every conceivable racketeering act, courts are nevertheless concerned when accepting a theory of proximate causation that would mean "no viable plaintiffs would remain to 'vindicate the law as private attorneys general.'" <u>Id.</u> at 38 n.12 (quoting <u>Holmes</u>, 503 U.S. at 269−70)).[9]

---

[9] The Healthy Pharms Defendants also suggest that under Plaintiffs' causation theory, nearly any business owner or property owner in the vicinity of a proposed RMD may claim damages for the

Turning to Safe Streets Alliance, 859 F.3d at 888, the case most analogous to the present action, the Tenth Circuit held that the neighbors to a marijuana growing facility plausibly pled that similar injuries to those alleged in this case—the diminished market value of their property and the nuisance of noxious odors of marijuana—were proximately caused by the public operation of the facility. See id. ("[I]t is reasonable to infer that a potential buyer would be less inclined to purchase land abutting an openly operating criminal enterprise than [he or she] would be if that adjacent land were empty or occupied by a lawfully-operating retailer."). Plaintiffs in this case, by filing an amended complaint, may add allegations that actual marijuana odors are interfering with the use of their properties, and that the open operation of the RMD has diminished the market value of the Plaintiffs' properties. The critical question of whether it is sufficient under Holmes and its progeny that the injuries alleged are direct "byproducts" of the location and manner in which the RMD operates in violation of the CSA, or whether the injury must more directly emanate from the sale of marijuana, will be better assessed once the Plaintiffs clearly set forth the alleged RICO violations and their injuries. Safe Streets Alliance, 859 F.3d at 891. A determination on proximate cause might also be suited "for a [summary judgment] motion under Rule 56 [more so] than a motion to dismiss under Rule 12(b)(6)," but the issue at least merits allowing the request for leave to amend. Trollinger v. Tyson Foods, Inc., 370 F.3d

---

same RICO violations. The number of potential victims suffering injuries to separate properties does not appear to raise the same concern at issue in Holmes, "that a violator might be obligated to pay double compensation if required to compensate those directly injured and those injured by the injury to those directly injured." Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 384 (2d Cir. 2001); see In re Neurontin Mktg., 712 F.3d at 37 n.11 ("There are, of course, other potential victims of Pfizer's scheme, such as uninsured individuals who paid for their own prescriptions. But any such injury would be different in kind from [plaintiff's] injury and could not be considered 'multiple' in that respect."). Unlike in Holmes, Plaintiffs here "are not alleging an injury that was derivative of injury to others," and are therefore not seeking to recover based on "the misfortunes visited upon a third person by the defendant's acts." Commercial Cleaning Servs., 271 F.3d at 384 (quoting Holmes, 503 U.S. at 268).

602, 615 (6th Cir. 2004) ("[A] RICO case with a derivative-injury problem is better suited to dismissal on the pleadings than a RICO case with a traditional proximate-cause problem (*e.g.*, a weak or insubstantial causal link, a lack of foreseeability, or a speculative or illogical theory of damages).").[10] The Healthy Pharms Defendants' motion to dismiss is therefore denied with leave to renew.

### 2. Century Bank

Plaintiffs bring only Count IV against Century Bank for violating § 1962(d) which makes it "unlawful for any person to conspire to violate any of the [substantive RICO provisions]." 18 U.S.C. § 1962(d). "To survive a motion to dismiss, a RICO conspiracy count must allege (1) that an enterprise affecting interstate commerce existed, (2) that the defendant knowingly joined the conspiracy, and (3) that the defendant intended to further an endeavor which, if completed, would have satisfied the pattern requirement of RICO." Laverty v. Massad, No. 08-cv-40126-FDS, 2009 WL 1873646, at *6 (D. Mass. Mar. 10, 2009) (citing Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1561 (1st Cir. 1994) and United States v. Cianci, 378 F.3d 71, 88 (1st Cir. 2004)). "The plaintiff does not need to allege that each conspirator agreed to commit (or actually committed) two or more predicate acts." Laverty, 2009 WL 1873646, at *6 (citing Salinas v. United States, 522 U.S. 52, 64 (1997)); see Salinas, 522 U.S. at 65 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a

---

[10] The Healthy Pharms Defendants may raise their argument that civil RICO does not provide an avenue for injunctive relief if the amended complaint presents the issue. See Absolute Activist Value Master Fund Ltd. v. Devine, No. 15-cv-328, 2016 WL 1572388, at *4 (M.D. Fla. Apr. 19, 2016) ("The circuits are split as to whether the federal RICO statute provides injunctive relief for private civil litigants."); compare Nat'l Org. for Women, Inc. v. Scheidler, 267 F.3d 687, 695 (7th Cir. 2001), rev'd on other grounds, 537 U.S. 393 (2003), with Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076, 1084 (9th Cir. 1986); see also Lincoln House, Inc. v. Dupre, 903 F.2d 845, 848 (1st Cir. 1990) ("[I]t is not clear whether injunctive or other equitable relief is available at all in private civil RICO actions.").

substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion."). "No overt act is required." <u>Id.</u> (citing <u>Salinas</u>, 522 U.S. at 64). "[A] defendant may be part of a RICO conspiracy even if he has not committed a substantive RICO violation." <u>Id.</u> (citing <u>Cianci</u>, 378 F.3d at 92).[11]

"Outsiders who help the enterprise accomplish its illicit goals, thereby evidencing their agreement to advance the cause, are fully liable under § 1962(d)." <u>United States v. Cornell</u>, 780 F.3d 616, 631 (4th Cir. 2015). To be liable, an outsider "must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." <u>Brouwer v. Raffensperger, Hughes & Co.</u>, 199 F.3d 961, 967 (7th Cir. 2000); <u>see</u> <u>Reyes v. Zion First Nat'l Bank</u>, No. 10-cv-345, 2012 WL 947139, at *6 (E.D. Pa. Mar. 21, 2012) ("Where a defendant is alleged to have conspired with a RICO enterprise to violate § 1962(c) by providing it what would ordinarily be lawful professional services, 'liability will arise only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity.'" (quoting <u>Salinas</u>, 522 U.S. at 537 & n.11)). Neither mere knowledge of, nor association with, the alleged conspiracy, however, makes Century Bank

_____

[11] The Court may address, after the filing of the amended complaint, whether Century Bank correctly asserts that the First Circuit requires a showing that an outsider like Century Bank managed or operated some aspect of the criminal enterprise to establish liability under § 1962(d). <u>Compare</u> <u>Ramírez-Rivera</u>, 800 F.3d at 20 (to prove RICO conspiracy, government must show "that the defendant participated in the conduct of the affairs of the enterprise" (citing <u>United States v. Shifman</u>, 124 F.3d 31, 35 (1st Cir. 1997))), <u>with</u> <u>Cianci</u>, 378 F.3d at 90 (RICO conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor" (quoting <u>Salinas</u>, 522 U.S. at 65)); <u>cf.</u> <u>United States v. Fernandez</u>, 388 F.3d 1199, 1230 (9th Cir. 2004), <u>modified,</u> 425 F.3d 1248 (9th Cir. 2005) ("[A] defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed that she 'knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise.'" (quoting <u>Smith v. Berg</u>, 247 F.3d 532, 538 (3d. Cir. 2001))).

a conspirator. See Abbott Labs. v. Adelphia Supply USA, No. 15-cv-5826-CB-ALB, 2017 WL

57802, at *9 (E.D.N.Y. Jan. 4, 2017); In re Reciprocal of Am. (ROA) Sales Practices Litig., No.

04-cv-2313, 2006 WL 1699403, at *7 (W.D. Tenn. June 13, 2006) ("[A]ssociation with

conspirators and awareness of illegal activity alone are not sufficient to demonstrate conspiracy

to violate RICO.").[12]

    Here, the non-conclusory allegations are that Century Bank had a banking relationship

with Healthy Pharms and knew that Healthy Pharms intended to operate a marijuana business.

The Complaint contains no specific information about the nature of the banking relationship or

the extent of the services that Century Bank provided. Plausible claims under § 1962(d)

generally involve allegations of a financial institution's involvement with the RICO enterprise

beyond providing ordinary banking services. Compare Meeks–Owens v. Indymac Bank, F.S.B.,

557 F. Supp. 2d 566, 569 (M.D. Pa. 2008) (denying dismissal of § 1962(d) claim by borrowers

against bank for fraudulent lending scheme where bank allegedly knew that the contract price

and mortgaged value of property substantially exceeded market value of property and provided

plaintiff false information about nature of the loan); and OSRecovery, Inc. v. One Groupe Int'l,

Inc., 354 F. Supp. 2d 357, 376 (S.D.N.Y. 2005) (denying dismissal of § 1962(d) claim against

bank alleged to have facilitated Ponzi scheme because plaintiff pleaded facts directly showing

knowledge of fraud); with Johnson v. U.S. Bank Nat'l Ass'n, No. 1:09-cv-492, 2010 WL

---

[12] Century Bank may also reassert its argument that it may only be liable for injuries caused by
its own RICO violations, and not the violations of its co-conspirators. But see Holmes, 503 U.S.
at 264 & n.6 (assuming without deciding that Ninth Circuit correctly held that defendant "could
be held responsible for the acts of all his co-conspirators"); United States v. Corrado, 286 F.3d
934, 937 (6th Cir. 2002) ("Unlike the general conspiracy statute, § 1962(d) requires no 'overt or
specific act' in carrying the RICO enterprise forward. Furthermore, 'the supporters are as guilty
as the perpetrators . . . so long as they share a common purpose, conspirators are liable for the
acts of their co-conspirators." (quoting Salinas, 522 U.S. at 63–64)); FCM Capital Partners LLC
v. Regent Corp. Consulting Ltd., No. 14-cv-07099-ODW, 2015 WL 420170, at *7 (C.D. Cal.
Jan. 30, 2015) ("[A]ll co-conspirators are liable for each other's acts in a RICO conspiracy.").

11538380, at *11−13 (S.D. Ohio May 12, 2010) (dismissing § 1962(d) claim against bank where plaintiff did not allege more than mere provision of basic services and no facts plausibly supported allegation that bank "agreed to conspire" with the enterprise).[13]

Moreover, the United States Treasury has issued guidance that "clarifies how financial institutions can provide services to marijuana-related businesses consistent with their [Bank Secretary Act] obligations, and aligns the information provided by financial institutions in the [Bank Secrecy Act] reports with federal and state law enforcement priorities," in order to "enhance the availability of financial services for . . . marijuana related businesses." United States Treasury, BSA Expectations Regarding Marijuana-Related Businesses, FIN-2014-G001 (issued Feb. 14, 2014). This guidance was effective at the time that Century Bank allegedly joined the conspiracy (and remains in effect), and Century Bank is not accused of committing any violation thereof.

At this stage, Plaintiffs have not adequately shown that providing ordinary banking services to marijuana-related businesses, in compliance with Treasury Department guidance aimed at enabling banks to provide such services, sufficiently demonstrates that it joined and intended to further a RICO conspiracy. Given, however, that the Court cannot fully assess the conspiracy claims without understanding the nature and extent of the alleged enterprise and predicate acts, the motion to dismiss is denied with leave to renew. Plaintiffs' amended

---

[13] In a similar context, "[c]laims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal representation." Domanus v. Locke Lord LLP, 847 F.3d 469, 482 (7th Cir. 2017); see RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP, 682 F.3d 1043, 1051 (D.C. Cir. 2012) ("[T]he complaint alleges no conduct by [defendant] beyond the provision of normal legal services in arbitration and so fails to support a reasonable inference that [defendant] agree[d] to assist others in the commission of unlawful acts." (internal quotation marks and citation omitted)); cf. Brennan v. Ferreira, 251 F. Supp. 3d 338, 342 (D. Mass. 2017) ("The First Circuit consistently has held that RICO liability does not attach [under section 1962(c)] where an accountant engages in no more than ordinary accounting functions on behalf of an enterprise.").

complaint may further develop the allegations regarding the relationship between Century Bank and Healthy Pharms, although providing basic banking services to a known medical marijuana dispensary in compliance with the Treasury Department's guidance, without more, may be insufficient to state a § 1962(d) claim.

3. Remaining Defendants

Plaintiffs apparently recognize that the allegations concerning the remaining named defendants—Red Line, Tomolly, and the 4Front Defendants—may be insufficiently detailed, as they make a contingent request for leave to file an amended complaint after conducting discovery. [ECF No. 65 at 22].

The Complaint contains little to no allegations that connect either Red Line or Tomolly to the alleged enterprise or conspiracy. Plaintiffs assert that Mr. Averill and Mr. Overgaag are authorized to execute documents on behalf of Red Line, that Red Line has an insurance policy through one of the John Doe insurance companies, and that "Red Line is used by Healthy Pharms' principals to extract profit from a supposed 'non-profit' entity." Compl. ¶ 35. Plaintiffs further allege that Red Line in some manner contributes to the management of the property at 98 Winthrop Street. The only allegations relevant to Tomolly are that (1) it is the existing tenant at 98 Winthrop Street, (2) Healthy Pharms' lease as the incoming tenant includes a $1 million buy-out payment to Tomolly, and (3) Mr. Overgaag once owned 98 Winthrop Street "through Tomolly." Compl. ¶¶ 37, 65, 87.

Plaintiffs have not sufficiently pled under § 1962(c) that Red Line participated in its operation and management. "[P]articipation in the operation or management of the criminal enterprise" is to be "plainly integral to carrying out the enterprise's activities." Ramirez-Rivera, 800 F.3d at 20 (quoting Shifman, 124 F.3d at 35−36). Here, the Complaint never identifies Red

Line's contribution to the enterprise, relying instead on the mere overlap of principals or directors among Red Line, Tomolly, and the Healthy Pharms Defendants to draw an inference as to Red Line's involvement. Plaintiffs provide no information about the nonprofit from which Red Line extracted profits, or how that organization or its funds relate to the marijuana business. Plaintiffs similarly provide no details about Red Line's alleged role in managing the property at 98 Winthrop Street. The Court cannot assume that Red Line was part of the enterprise and plainly integral to its operation, based solely on the overlap of officers between it and Healthy Pharms.

Moreover, the Complaint lacks the requisite level of detail to plausibly show that Red Line and Tomolly knowingly joined a conspiracy and intended to further it as required by § 1962(d). Although Plaintiffs claim that Tomolly was owed $1 million under Healthy Pharms' lease, Plaintiffs do not allege that Tomolly actually received that payment, that the payment was made from the proceeds of the marijuana business, or that Tomolly used such funds to support the conspiracy. Similarly, the allegation that Mr. Overgaag or Mr. Averill use Red Line to extract profit from a nonprofit is insufficient to infer that Red Line thereby intended to further the criminal purposes of the enterprise, because the Complaint draws no connection between the nonprofit, the extracted funds, and the dispensary. The mere fact that officers of Healthy Pharms also occupy a role in Red Line and Tomolly does not sufficiently show that these entities joined the conspiracy and furthered its criminal endeavors.

The conspiracy claim against the 4Front Defendants is similarly based on vague generalities. 4Front Advisors, LLC allegedly maintains a website "that facilitates the providing of material support to marijuana companies," including Healthy Pharms. Compl. ¶ 36. On information belief, Plaintiffs allege that Mr. Krane and employees of 4Front Advisors, LLC

communicated with the Healthy Pharms Defendants about their dispensary. Id. Although the meaning of this allegation is unclear, Plaintiffs state that "[u]pon information and belief, 4Front Holdings provides or has provided monetary and material support and/or is the beneficiary of consulting activities concerning marijuana conducted by [4Front Advisors, LLC] that has materially supported Healthy Pharms and the other defendants." Id. The Complaint does not describe with any detail the "consulting activities" or "material support" provided by the 4Front Defendants, nor is it clear that Healthy Pharms ever received such benefits. The 4Front Defendants may have interacted with the Healthy Pharms Defendants, but there is no basis to infer that they joined the conspiracy or intended to further a pattern of racketeering activity.

Plaintiffs are granted leave to amend their allegations as to the 4Front Defendants, Red Line, and Tomolly but they must satisfy the standards of Rules 8(a) and 12(b)(6) prior to discovery. See Kalimantano GmbH v. Motion in Time, Inc., 939 F. Supp. 2d 392, 409 n.4 (S.D.N.Y. 2013) (rejecting plaintiffs' assertion that with an opportunity to serve a subpoena on a third party, they can satisfy the pleading standard). They provide no justification for the Court, at this stage, to preemptively grant them leave to amend during or after discovery. See Pruell v. Caritas Christi, 678 F.3d 10, 15 (1st Cir. 2012) (requiring plaintiffs to plead a claim that "looks plausible based on what is known," where information may have been in defendants' control). Accordingly, the motions to dismiss filed by the 4Front Defendants, Red Line, and Tomolly are denied with leave to renew.

## VII.    CONCLUSION

For the foregoing reasons, the Government Defendants' motions to dismiss [ECF Nos. 51, 52] are GRANTED and the remaining motions to dismiss [ECF Nos. 49, 54, 57, 60] are DENIED with leave to renew. Plaintiffs may file an amended complaint within 30 days.

**SO ORDERED.**

August 21, 2018                                              /s/ Allison D. Burroughs
                                                             ALLISON D. BURROUGHS
                                                             U.S. DISTRICT JUDGE